UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SANG LAN,<br><br>                         Plaintiff,<br><br>v.<br><br>Time Warner, Inc., Kao-Sung Liu a/k/a K.S. Liu, Gina Hui-Hung Liu a/k/a Hui-Hung Sie a/k/a Gina Liu, individually and as trustees or managers of Goodwill For Sang Lan Fund, Hugh Hu Mo, Does 1-30, unknown defendants, jointly and severally,<br><br>                       Defendants. | Civil Action Case: 1:11-CV-02870-LBS-CJF<br><br><br>FOURTH AMENDED COMPLAINT<br><br><br>Plaintiff Demands Trial By Jury<br>As To All Counts Triable by Jury |

Table of Content

Nature of the Case.................................................................................................................. 3

Parties..................................................................................................................................... 3

Jurisdiction and Venue........................................................................................................... 5

Factual Background And Common Allegations ...................................................................... 6

    The Athlete........................................................................................................................ 6
    The Games ........................................................................................................................ 8
    The Accident.................................................................................................................... 10
    The Trauma...................................................................................................................... 12
    The Fault ......................................................................................................................... 15
    The Tape .......................................................................................................................... 17
    The Publicity................................................................................................................... 20
    The Promises................................................................................................................... 21
    The Fiduciaries................................................................................................................ 26
    The Attorney................................................................................................................... 28
    The Fund ......................................................................................................................... 30
    The Control ..................................................................................................................... 36
    The Betrayal.................................................................................................................... 41
    The Privacy Invasion ...................................................................................................... 43
    The Defamation .............................................................................................................. 44
    The Cyberharassment...................................................................................................... 48
COUNT ONE: BREACH OF CONTRACT (Against Time Warner)........................................ 50

COUNT TWO: PROMISSORY ESTOPPEL (Against Time Warner)...................................... 57

COUNT THREE: UNDERTAKING AND RELIANCE (Against Time Warner)...................... 58

COUNT FOUR: ACCOUNTING AS TO THE FUND (Against the Lius and Mo)....................59

COUNT FIVE: ACCOUNTING AS TO OTHER PROPERTY (Against the Lius)....................60

COUNT SIX: UNJUST ENRICHMENT (Against the Lius).......................................................61

COUNT SEVEN: CONVERSION (Against the Lius)..................................................................63

COUNT EIGHT: BREACH OF FIDUCIARY DUTY (Against the Lius) ................................65

COUNT NINE: BREACH OF FIDUCIARY DUTY (Against Mo) ............................................67

COUNT TEN: DEFAMATION (Against Liu)............................................................................68

COUNT ELEVEN: INVASION OF PRIVACY .......................................................................70

COUNT TWELVE: CYBERHARASSMENT [Against the Lius and Does 1-30] ....................71

Exhibits Attached to Fourth Amended Complaint ...................................................................74

<u>FOURTH AMENDED COMPLAINT</u>

Plaintiff, SANG LAN[1], by and through her undersigned attorneys, for her complaint against defendants, whose names appears in the caption above, jointly and severally, alleges as follows:

<u>Nature of the Case</u>

Plaintiff brings this action for compensatory and equitable relief against certain corporate defendants, individual defendants who were trustees, fund managers, professionals or attorneys having fiduciary relationship with the Plaintiff, and certain yet to be identified defendants for breach of contract, promissory estoppel, undertaking; accounting, unjust enrichment, conversion of personal property, breach of fiduciary duty, defamation, invasion of privacy and cyberharassment.

<u>Parties</u>

1.      At all times relevant, Plaintiff Sang Lan is a citizen of the People's Republic of China and a resident of Beijing, China ("Sang Lan" or "Plaintiff").

2.      On information and belief and at all times relevant, Defendant Time Warner, Inc. is a New York corporation, with its principal place of business at One Time Warner Center, New York, New York 10019 (hereinafter "Time Warner"). As used in this Fourth Amended Complaint, "Time Warner" includes, as the context permits, Turner Broadcasting System, Inc., One CNN Center 13NT, Atlanta, GA 30303; Turner Sports, Inc., 1015 Techwood Drive, Atlanta Georgia 30303; 1998 Goodwill Games, Inc., or any subsidiary or affiliate companies who may or

---

[1] Plaintiff's surname is Sang and given name Lan. During and after the 1998 Goodwill Games in New York, she was and is referred to and known as Sang Lan, by the media, apparently following the Chinese custom of placing the surname in front of the given name.

may not be named as co-defendants herein, who are organizers of the 1998 Goodwill Games held in New York.

3.      On information and belief and at all times relevant, Defendant Kao-Sung Liu a/k/a K.S. Liu (hereinafter "K.S. Liu" or "Liu") and Defendant Gina Hiu-Hung Liu a/k/a Hui-Hung Sie (hereinafter "Gina Liu")[2] are husband and wife (collectively the "Lius"). They are U.S. citizens who reside in 20 Shadow Tree Lane, Briarcliff Manor, New York 10510.[3] From 1998 through July 2008, the Lius were appointed, held themselves out, acted as "guardians" for Sang Lan, and served as trustees or managers of a certain trust fund known as "the Goodwill for Sang Lan Fund" (hereinafter the "Fund" or the "Sang Lan Fund"). From 1998 through April 28, 2011, Lius also held themselves out and acted as Sang Lan's exclusive agent and exercised total and exclusive control over Sang Lan's affairs in the United States.

4.      On information and belief and at all times relevant, Defendant Hugh Mo a/k/a Hugh H. Mo a/k/a Hugh Hu Mo is a U.S. citizen and resident of New York (hereinafter "Mo"). Mo is the principal stakeholder or member of the Law Firm of Hugh H. Mo, P.C. with its principal place of business at 225 Broadway, Suite 2702, New York, New York 10007 (hereinafter "Mo Law Firm"). From approximately 1998 through July 2008, Mo and Mo's Law Firm either held themselves out and acted as Sang Lan's attorney and/or also acted as attorney for the Sang Lan Fund.[4] While acting as Sang Lan or the Fund's attorney, Mo and Mo Law Firm acted as attorney for the Lius. (Where context permits, Lius, Mo and Mo Law Firm are collectively referred to as the "Fiduciaries").

---

[2]  On information and belief, Defendant Gina Liu's maiden name was Hui-Hung Sie. She has since used a variety of names, such as Gina Liu, Gina K.S. Liu, Gina H.H. Liu, and Gina Hui-Hung Liu.
[3]  At the time of the filing of the initial complaint, the Lius resided at 17 Whippoorwil Road, Armonk, New York 10504.
[4]  As used in this Fourth Amended Complaint, the term "Mo" includes, as the context permits, Defendant Hugh Mo and the Law Firm of Hugh H. Mo, P.C., which are liable to Plaintiff for acts through the Mo or Mo Law Firm or vice versa.

5.      DOES 1-30 are individuals or business entities of unknown identity or form or identified by fictitious names that participated in the activity which is the subject of this action.

6.      Plaintiff does not know the true names and capacities of the defendants named in this action as DOES 1-30, and therefore sues them under fictitious names. Plaintiff will request permission to amend this Complaint to state the true names and capacities of these fictitiously named defendants when she ascertains them.

7.      Plaintiff is informed and believes, and alleges on this ground, that these fictitiously named defendants are legally responsible in some manner for the acts and omissions set forth below, and therefore are liable to her for the relief requested.

8.      Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned each of the defendants was the agent, servant, employee, and/or co-conspirators of each of the other defendants, and, in committing the acts hereinafter alleged, were acting within the course and scope of their authority as such agent, servant, employee, and/or co-conspirator with the permission and consent of their co-defendants and, further, that the defendants, and each of them, have authorized, ratified, and approved the acts of each of the other defendants with full knowledge of those facts.

## Jurisdiction and Venue

9.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1332 over questions of state law when the dispute is between citizens of different states and the amount in controversy exceeds $75,000. There is complete diversity between the parties as Plaintiff is a citizen of China and all named defendants are either citizens of New York State or corporations of the United States. The matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

10.      Venue is proper in this District pursuant to 28 U.S.C. §1391 as the cause of action

occurred in this District and all of the defendants reside or do business in this District.

Factual Background And Common Allegations

*The Athlete*

11.     At all times relevant, Plaintiff, Sang Lan, was former Chinese National Gymnastic Champion and former member of the Chinese National Gymnastics Team in 1998, a true and correct copy of the 1998 Goodwill Games press release containing Sang Lan's biographic information is attached hereto and incorporated by reference and marked as Exhibit A (1988 Goodwill Games Press Release: Sang Lan's Bio Information).

12.     Sang Lan was born June 11, 1981 in Ningbo City, China. She is the only child to Xiu Feng Chen (mother), a factory worker, and Shi Sheng Sang (father), a housing management employee.[5]

13.     At the age of five in 1986, she began training as a gymnast at a local sports' school.

14.     At the age of eight, showing considerable talent in the sport, Plaintiff was recruited and joined the Zhejiang Province Sport Team. She left home and her parents to train and compete in nationwide gymnastic competitions.

15.     In 1993, Sang Lan was chosen for the Chinese National Gymnastics Team. To be selected for the Chinese National Gymnastics Team is the highest honor for a gymnast in the profession. It also entailed hard work and demanded sacrifices from the athletes and their families.

16.     Due to the rigorous training and discipline required for the sport, Sang Lan left home and lived with her teammates and coaches in Beijing, hundreds of miles away from home. Her parents, limited in means and restricted by rules, rarely saw their daughter. They saw her a total

---

[5] Both parents are now retired.

of three times since she left home at the age of 12. The distance, lack of mobility and resources, and strict rules against distractions made such visits difficult. A copy of an article from Sports Illustrated is attached hereto and incorporated by reference and marked as Exhibit B (Sports Illustrated: Paralyzed Gymnast's Parents Begin Sad Journey To Her Bedside. 7/24/1998. AP Reports).

17.     By necessity and tradition, the national team became Sang Lan's family. Coaches and team leaders, who supervised her daily life and finances, became surrogate parents for Sang Lan and her teammates. Sang Lan's parents trusted these leaders and always encouraged Sang Lan to do the same. The team leaders and coaches worked diligently and devoted most of their time and effort into grooming Sang Lan and her teammates for national and international championships. She placed her complete faith and trust in the system, the team, the coaches and the team leaders.

18.     Sang Lan achieved excellence in gymnastics at a young age, winning the all-around and every single event final at the 1991 Zhejiang Province Championships. In 1988, she won 5 individual championship titles in addition to the women's team event at the Zhejiang Province Games.

19.     By 1995, she was competing nationally with outstanding results. She placed third on vault and second all around at the 1995 Chinese National Games. Sang Lan won the championship title in the 1997 Chinese National Games. She dominated the event vaults in the world competitions and also the 1996 and 1997 American Cup meets. She was selected for the Chinese National Team to compete in the 1998 Goodwill Games. At the age of 16 and having won the national vault title in the 1997 Chinese National Games, Sang Lan was considered the strongest contender for world titles, including the gold medal in the Olympic Games and the vault championship title at the 1998 Goodwill Games.

*The Games*

20.     The Goodwill Games, a product of Cold War era, was an international sports competition, held every four years during the summer in even non-Olympic years (the "Games"). The initial idea was conceived by Turner Broadcasting System and CNN founder, Ted Turner, in reaction to the political troubles surrounding the Olympic Games of the 1980s. After the Soviet Union invaded Afghanistan in 1979, the United States and other Western countries boycotted the 1980 Summer Olympics in Moscow. The Soviet Union and its allies (Eastern Bloc countries) retaliated by boycotting the 1984 Summer Olympics in Los Angeles. Ted Turner promoted and touted the Goodwill Games. The organizers claimed that the Goodwill Games was an international, multi-sport invitational event uniting the world's best athletes. Competitors were the world's most elite athletes, invited based on rankings and performances in major international competitions including Olympic Games, World Championships and past Goodwill Games. Sang Lan was selected based on these criteria.

21.     The first game was held in 1986 in Moscow, Soviet Union, organized and presented by a partnership of Turner Broadcasting Systems, the USSR State Committee for Radio and Television and the USSR State Committee for Physical Culture and Sports (August 6, 1985). The last game ended in Brisbane, Australia in 2001.

22.     Ted Turner's last Goodwill Games were in 1998 in New York City, during which Sang Lan competed (the "1998 Games" or "Games"). Time Warner later bought the Games from Ted Turner when Turner's company merged with AOL. AOL Time Warner cancelled the Games after Turner left management of Time Warner.

23.     Although it was touted as an attempt by a well-wishing private citizen to ease tensions during the Cold War through friendly athletic competition between nations, the main goals

manifested by Turner and his companies were to create a TV event. The Games' main focus was always on television broadcasting events or revenues. The competition was broadcast live with recording devices from strategic angles at the competition floor or arena. U.S. television audiences had access to more than 129 hours of television coverage via TBS and syndicated stations. Viewed in 66 countries, almost 200 hours of competition and ceremonies programming were made available to world broadcasters. Time Warner claimed that it has an audience of more than 482 million TV households. Worldwide attention focused on the Games' competition as 81 countries televised the Games, and more than 1,100 journalists from nearly 30 countries covered the event. TBS's cable-exclusive telecast reached more than 45 million homes in the United States.

24.    The Games lasted generally 16 days and consisted mostly of summer sports, with a few winter sports, including figure skating. The US Gymnastics Federation sanctioned the meet organized by Time Warner.

25.    At all times relevant, Time Warner and its affiliated company invited athletes by their ranking in the world competitions to the Goodwill Games and were responsible for selecting the equipment, the vault and the stadium for the event, and supervised the competition floor for the 1998 Goodwill Games.

26.    As the sponsor and organizer of the Games, Time Warner had a legal duty to provide reasonably safe equipment and duty to provide a reasonably safe environment for the world's best athletes to compete safely, free from distraction and interference.

27.    At all times relevant, Time Warner either expressly or implicitly gave its assurances to the athletes, including the athletes from China National Team, that the environment was safe for practice and competition; that athletes could safely compete in the Games, free from distraction

and interference from others.

*The Accident*

28.     In 1998, Sang Lan and her teammates of the Chinese National Team were invited by Time Warner and Ted Turner to compete at the 1998 Goodwill Games at Nassau County Coliseum in Long Island, New York. The gymnast professionals, coaches and commentators paid a great deal of attention to Sang Lan because she was the Chinese National Champion and winner of several titles in gymnastics and one of the strongest contenders for the championship, particularly the vault event. She consistently showed her skill and techniques in performing a near perfect vault.

29.     On the evening of July 21, 1998, the gymnasts for the vault event gathered around the floor and began warm up exercises.

30.     Sang Lan was performing a vault called a "Layout Cuervo" routine. The "Layout Cuervo" routine consists of a handspring, a half-turn off the vault horse, a backward flight in a layout position and a blind landing. Because of the high degree of technical difficulty, the "Layout Cuervo" has a starting value of 9.9 on a scale to 10. Not all the athletes can successfully perform this type of vault. Sang Lan was one of the very few who could complete the Layout Cuervo routine with a perfect or near perfect landing. She had the consistency in skill and mastery of technique in this particular jump.

31.     On this evening, she had finished the first warm up and successful "Layout Cuervo" vault practice runs as she had done so for many years and for hundreds if not thousands of jumps. She landed perfectly. Her coach wanted one more jump before the competition began. Her Coach knew that she always did better after the first jump.

32.     At all times relevant, Sang Lan noticed and was aware of the presence of recording

cameras or devices from the side and up in the air, recording her movements on the competition floor.

33.     Ahead, one Romanian athlete was finishing her jump. The Romanian girl left the vault area. Briefly stopping to focus on her routine and breathe in a few times, Sang Lan took off. As she ran on the runway in high speed and a few meters away from the vault horse, a person unexpectedly appeared in the landing area and began pulling away the mattresses. The momentum, the speed and proximity were such that she was unable to stop the routine.

34.     Distracted by the unanticipated intrusion, Sang Lan was unable to adjust herself properly. She landed directly on her head, breaking and dislocating two neck vertebrae.

35.     The person who caused the distraction reached Sang Lan first because he was pulling the mattress from the landing zone. He was later identified as Octavian Belu, the Romanian team coach. He was interviewed on July 23, 1998 after the accident and admitted that he was near the vault horse at the time of the accident.

36.     According to Mr. Belu, one of the Romanian athletes finished a warm up jump. The Romanian's jump was not difficult and thus required an extra layer of 3-5 inch mattress. Earlier, the Romanian coach saw Sang Lan finishing a perfect Layout Cuervo jump. Belu thought Sang Lan would not need the extra layer of mattresses for her jump. Belu went to the landing area near the vault to pull away the mattress. Tragically, he did not realize that Sang Lan was already near the vault horse in full speed, as he came near the landing zone and pulled away the mattress.

37.     After the fall, Sang Lan was in and out of a coma. On the way to the hospital, she thought she was dead because she could not breathe. When she regained consciousness, she told her coach and team leader that this was not a practice mistake; and that she saw the Romanian coach pulling the mattress away. The team leader and coach wanted Sang Lan to focus on the medical

treatment and surgery.

*The Trauma*

38.     The compressive forces from the fall fractured and severed Sang Lan's C6 and C7 vertebrae and injured her spinal cord.

39.     The result of this injury was permanent paralysis from the mid-chest down. She will never recover sensation or function from the mid-chest down.

40.     In addition to the vertebral fractures, the spinal sac was damaged, causing a leakage of cerebral spinal fluid, and portions of the spinal cord and nerve root were pulverized. Doctors inserted metal screws and rods into her back to stabilize her upper body. After the surgery, Sang Lan was transferred to Mount Sinai's rehabilitation center, where she spent approximately one year undergoing intensive rehabilitation.

41.     The prognosis was that the spinal cord injury was permanent; that for the rest of her life as a high level C-6/C7 quadriplegic she would not walk again, and struggle, on a daily basis, against the life-threatening complications. Among the problems and complications associated with this type of spinal cord injury are: pressure sores (decubitus), thrombosis, pneumonia, inflammation, autonomic dysreflexia (AD), kidney (renal) failure, urinary tract infections (UTI), and other nerve-related complications. If not carefully monitored or treated, the complications may cause additional injury or life-threatening conditions.

42.     The spinal injury caused a total loss of the use of her arms and hands as well as bladder and bowel control. She depends on others to assist her to go to the bathroom multiple times daily. In addition to the emotional pain and humiliation from losing control over her bodily functions, she suffers recurring urinary tract infections, which expose her to potentially fatal kidney diseases. Improper bladder care will result in infection, kidney failure and life threating

complications.

43.     Sang Lan also suffers severe bruising, which takes months to heal due to diminished circulation in her lower body. Her feet swell and are susceptible to cracking and bleeding. The constant pressure from sitting in her wheelchair has caused bone structure deterioration, which will worsen over time. She suffers from disfigurement, with shrinkage and disfigurement in both hands and, despite physical therapy, needs assistance in completing simple tasks.

44.     Due to lack of circulation or movement, her extremities and lower body lost significant muscle strength. She is susceptible to bone fractures because deterioration of bone mass and structure. A normal daily activity such as getting on and off a vehicle may accidentally cause bone fractures.

45.     Sang Lan's resulting paraplegia ended her active life and forced her to painfully relearn basic aspects of daily living, some of which she will never regain. She lives in severe and constant pain that will increase over time. Her accident left her with no sensation from the chest down, except "phantom pain", a constant burning sensation below her chest. Above her chest, she suffers constant pain, feels painful pressure on her back, sides, and the parts of her body where she still retains sensation. She struggles on a daily basis with intermittent spasms of stabbing, debilitating pain.

46.     Medication can only provide temporary pain relief, but the strong medication Sang Lan requires has serious side effects. It causes her to lose alertness, which makes it impossible to drive. It interferes with her ability to communicate socially. It makes her unsteady in her wheelchair. She also runs the risk of becoming addicted to the medication. There is a constant conflict between efforts to reduce her pain and the incapacitating side effects of the medicine itself.

47.    Sang Lan relies on such medication to fight infections, which may cause resistance to other crucial drugs. Sang Lan also depends on receiving a steady supply of these medicines and medical supplies from a safe source such as those prescribed by her doctors in the United States. Many medical supplies prescribed by her doctors for Sang Lan may not be available in China. Simple items, like safe and quality catheter tubes, not readily available in China, and the safe and steady supplies of vital medicines is a top concern in Sang Lan family and caretakers, as incorrect and interruption of supplies will cause deterioration in Sang Lan's disability condition, if not a life threatening issue. Hence Sang Lan needs the U.S. supplies because the likelihood of inadvertently obtaining counterfeit drugs is minimal in the United States.

48.    The accident robbed her of a normal life and her teenage years. Before the accident, Sang Lan was an active and successful athlete with a bright and promising future of a world-class gymnast, full of potential and opportunities. But for the accident, she was widely predicted to win several championships at international competitions, such as the Olympic Games, the World Championship and the Goodwill Games.

49.    Sang Lan can no longer compete in the gymnastics or engage in the active lifestyle she once enjoyed or could have enjoyed.  She would never enjoy the things a world champion would have enjoyed. Her dream of competing in the Olympic Games on behalf of her country will never be realized. In fact, Sang Lan may never have the opportunity to lead a normal and healthy life.

50.    Before the accident, she was a fun loving, energetic and playful teenage girl who adored Leonardo DiCaprio, Celine Deon, and the Spice Girls. She would sneak out the dorm at night to go to movies with teammates. Sang Lan will never have the chance to live a normal adolescent life. Sang Lan is unable to visit places inaccessible to her. She must sleep in a separate room and

14

be constantly attended by and dependent on others.

51.     She may never be able to have a child.

52.     She has changed from a giving, enthusiastic, independent person who took joy in aiding others, to being dependent on others for almost every aspect of her life.

53.     The injuries to Sang Lan dramatically changed Sang Lan's parents' lives as well. The parents became her caregivers and must assist her with most aspects of her life. This tedious routine involves showering and catheterizing her, transferring her in and out of her wheelchair. There is always the worry that she may fall if she tries to get up on her own. Several times a night, one of the parents must wake to turn Sang Lan over in bed so that she will not get bedsores.

54.     Both parents lost their jobs because they had to decrease their work schedules to care for their daughter. They had no choice as they must assist their daughter during the day and accompany her to medical appointments and therapy. They perform the household work that their daughter is unable to do. Now retired, they cannot afford a nurse and full time care at home. They spend most of their time trying to accomplish the mundane chores of daily life. Every day, the parents share their daughter's constant pain, frustration and anxiety.

*The Fault*

55.     The experts believe that the accident and resulting injuries were caused by a hesitation half way through the routine and that the hesitation was mostly likely caused by a distraction or unexpected intrusion into the view of the athlete after the athlete was already in full motion, in high speed and close to the vault horse. Eyewitness accounts and admission by the Romanian coach placed Romanian coach next to the horse when the accident happened; and that he was first by Plaintiff side. This showed or tended to show that on the competition floor, there was

confusion, lack of organization or safety measures present or close to the vault horse, when Sang Lan was performing this potentially dangerous routine, contrary to protocol and good practice.

56.     According to reports and eyewitness recollections, the culpability or liability of Time Warner and others as organizers of the Games was relatively clear in that professionals and experts of the sport agreed that Time Warner's lack of organization or supervision and lack of order and presence of large number of persons allowed by Time Warner to be in close proximity to the vault horse at the time when many athletes were performing potentially dangerous routines showed or tended to show negligence on the part of Time Warner, which substantially contributed to the accident if not exclusively causing it.

57.     Sang Lan would not have commenced the routine if she knew the competition floor was unsafe.

58.     Sang Lan, like many other athletes, assumed that Games organizers had safety measures in place. For example, athletes were required to enter the stadium gates with identification cards and through security checks. However, the competition area was not well organized and displayed a lack of protocol that night.

59.     Time Warner had the exclusive rights to record any and all events at the Games. There were camera or recording devices along the runway, overhead and near the vault horse, which would have recorded and showed Sang Lan's movement or performance during her routine. It would have also shown that Sang Lan was correct in recounting the sequence of events leading to the accident in which the Romanian Coach was pulling away the mattress, or evidence showing or tending to show culpability on the part of Time Warner at the time of the accident. Conspicuously absent from Time Warner reporting, and on the Internet, were any photos or tapes showing the sequence of events leading up to the accident. On information and belief, Time

Warner eradicated, hid, and/or concealed films or recordings of the accident and otherwise prevented any of films or recordings of the accident from being released or leaked. At all times relevant and unknown to Plaintiff at the time, there was a concerted effort by the organizer, Time Warner and its affiliated companies to eliminate and eradicate all recording, photos, or video taping or tapes of any kind showing to tending to show the sequence of events leading to Plaintiff's accident.[6]

60.     At all times relevant and unknown to Plaintiff at the time, Time Warner denied the existence of any tape or recording of the sequence of performance or the accident.

61.     However, it was recently discovered that some photos obtained by Plaintiff showed that there was some recording cameras either overhead or alongside the competition floor, which would have recorded sequences or movements of the athletes performing the routines. Photos of such purported recording devices are attached hereto, incorporated by reference, and marked as Exhibit C (Photos Showing Recording Cameras).

*The Tape*

62.     At all times relevant and unknown to Plaintiff at the time, and on information and belief, on July 21, 1998, a Mr. Jack Carter was making a film recording Plaintiff's routine at the 1998 Goodwill Games (the "Tape" or "Carter's Tape").

63.      Mr. Carter was a coach for the Parkettes National Training Center in Allentown. He was filming the routines of world-class athletes to help the gymnasts of his hometown team to improve their skills.

64.     Immediately after Plaintiff fell on July 21, 1998, while doctors attended to her, Mr. Carter

---

[6]  The only available video images or tapes of Sang Lan's vault jump currently on the Internet were from her performance before the 1998 Games or before the injury occurred.

made his way to the vault and showed the Tape to an orthopedic doctor so that the doctor could tell the emergency staff at the hospital what to look for. As soon as Time Warner or a representative of the Goodwill Games working on the floor learned about the Carter's Tape, they tried to seize it from Mr. Carter. Attempts to get the Tape from Mr. Carter by the Time Warner's representative became physical and very confrontational, including a threat to bring a lawsuit against Mr. Carter. Eventually, Mr. Carter was escorted out of the arena by two security guards for his personal safety. According to Mr. Carter, Time Warner was very concerned about the existence of the Tape and its liability toward Sang Lan. A security guard from the arena accompanied Carter into a van to the nearby Marriott hotel. They entered from the rear, went in through the kitchen and onto a service elevator. When they reached his room, the security man checked the room before letting Carter in. Thereafter, Time Warner and its agents placed many phone calls to Mr. Carter and wanted to discuss terms for turning over the Tape with Mr. Carter's agent. Among the callers was a high-ranking official of the Goodwill Games and Kathy Scanlan, former USA Gymnastics president. Mr. Carter was "very scared" and thought he was "going to be harmed." The following day, Ms. Kathy Scanlan reached him by phone and told Mr. Carter "TBS doesn't want it anymore but doesn't want anybody else to have it." [7]

65.     It was apparently made it clear to Mr. Carter that it was in his best interest that the Tape would never see the light of the day.

66.     Time Warner and its affiliated companies were clearly concerned about the existence of this Tape.

67.     Long before Sang Lan knew about the existence of the Carter Tape, Time Warner told

---

[7] The detailed account of events given by Mr. Carter is reproduced in Exhibit D (Local Coach Hounded For Tape Of Chinese Gymnast's Injury - Jack Carter Happened To Film Sang Lan's Fateful Routine At Goodwill Games. Suddenly, Everyone Was Looking For Him. 8/26/1998. By Paul Reinhard).

Sang Lan's attorney that there was no recording or taping of Sang Lan's jump in July 1998 even though it knew that Carter's tape would show that Time Warner was liable to Sang Lan for causing or substantially contributing to if not exclusively causing the accident.

68.     On information and belief after investigation and inquiry, Carter did not give the Carter Tape to Time Warner.

69.     On information and belief after investigation and inquiry, Carter warned Time Warner of the cause of the accident in 1998 and fought hard to preserve the evidence. Time Warner engaged in discussions with caregivers and Chinese team leaders and misrepresented or concealed the existence of possible evidence showing its culpability.

70.     Carter's Tape and the facts and circumstances surrounding Carter's Tape showed or tended to show that Time Warner, by concealing or destroying and misrepresenting the existence of evidence, acted with oppression, fraud or malice, a conscious disregard for safety, and engaged in conduct inconsistent with comportment acting without fault.

71.     Prior to 2011, Plaintiff was not informed of the existence of the tapes or recording set forth above by her agents, her attorney, Time Warner or anyone. She did not discover the existence of such tapes or recordings until after problems developed with her fiduciaries after 2011. Plaintiff did not discover and could not have discovered the existence of such tapes or recordings because she placed her confidence in her fiduciaries and was precluded from acting or investing on her own by her relationship with her fiduciaries. On information and belief, and on that basis Plaintiff alleges that Time Warner concealed these tapes from Plaintiff. After the fall out with the Fiduciaries, Plaintiff received anonymous tips of the existence of such tapes or evidence.

*The Publicity*

72.    This traumatic and tragic accident would have crushed and destroyed any teenage girl. She was alone, unsophisticated, and her parents were unable to help in a strange and foreign country.

73.    At the hospital, doctors informed the Chinese team leaders the grim reality that as result of the fall, she would remain paralyzed below her chest and would be struggling to maintain a normal life. She will also combat medical complications for life. Sang Lan woke up and asked when she could return to the competition floor. Her coach and team leader could hardly fight back their tears. Reports of reactions to Sang Lan's plight also appeared in an article reproduced in Exhibit E (New York Daily News: Tragedy Gets The Best Of Vet Lampley. 7/24/1998. By Bob Raissman).

74.    Sang Lan's tragedy and her courage were reported widely. There were daily press releases by Time Warner informing the public of the progress of her medical treatment. The focus was directed to her condition, her family and her story, away from culpability of the organizers, the cause of the accident, and the concerns about the safety of the sport.

75.    The public was moved by Sang Lan's innocence, and inspired by her courage and resilience, when she came face to face with the devastating and cruel reality that she was unlikely to walk again.

76.    The American people and people from around the world were deeply touched by the teenage gymnast. They admired her courage in facing a horrible future after a unthinkable sudden change in her life. Among the people who visited Sang Lan were: singer and actor, Celine Dion who brought Sang Lan a frog; actor and activist Christopher Reeve; actor Leonardo DiCaprio with a bear and a greeting card; Football player Byrd came with a paper crane, given to

him when he was injured; Jackie Chan, Chinese Vice Premiere Qian Qishen and wife; Chinese Foreign Minister Tang Jiaxuan, and many other well wishers. She received gifts and letters from Former President Jimmy Carter and wife, Rosalynn Carter; letters from former President Ronald Reagan with an elephant and a box of candy; Vice President Al Gore and his wife; then First Lady Hillary Clinton with a letter from President Clinton; former President of the International Olympic Committee, Juan Antonio Samaranch; former President George Bush and wife Barbara Bush; and thousands of greeting cards, mail and donations from people from all walks of life. New York mayor, Rudolph Giuliani, invited Sang Lan to lower the Time Square ball for New Year in 2000. The letters, souvenirs, photos, memorable items and documents from these people ("Memorabilia") belonging to Sang Lan were kept by the Lius for "safe keeping" and have not been returned to her despite repeated demands.

*The Promises*

77.     As the strongest contender for a world title and the 1998 Goodwill Games Championship, Sang Lan had important rights to assert against many, including but not limited to bringing action to seek or recover damages from Time Warner, the 1998 Goodwill Games, US Gymnast Federation, the insurance carriers, equipment manufacturers, event promoter and landlord's premises liability, the coaches, arena owners, and any and all persons or entities, which could have been liable to her for failure to exercise due care under the circumstances.

78.     Time Warner was fully aware of Sang Lan's rights and the existence of Mr. Carter's tapes.

79.     The ensuing publicity after the tragic accident brought attention and caused great concern about the safety of the sport and potential liability for Time Warner, as the sponsor and organizers of the event.

80.     There was concern by the media about the potential lawsuits and the future of the teenage girl. However, Time Warner diverted attention away from the perceived danger of the sport because of Plaintiff's accident; the potential problems in the organization or poor management of the Games; the disorder and confusion in the competition areas; the distraction and interference by others near Plaintiff's competition area; the express or hidden unsafe environment created by the organizers; the inherent danger of the location or the equipment[8], all tending to show that Time Warner was negligent and was liable for causing Plaintiff's accident.

81.     Whenever there was a question about Time Warner's responsibility, Time Warner carefully diverted the attention away from the potential liability it may have toward Sang Lan, by emphasizing the need to focus on medical issues.

82.     On information and belief, the Fiduciaries publically stated that Time Warner told them that there were no tapes or any recording of the accident. Time Warner did not tell them about Carter's Tape.

83.     After the accident, among the confusion, it was clear that Sang Lan and her Fiduciaries were dependent on Time Warner for their support, medical care and other assistance.

84.     In communications with her Fiduciaries, Sang Lan was made aware of and understood that if Time Warner and Goodwill Games were challenged in some fashion, any hope of getting assistance from Time Warner would be extinguished. Plaintiff and her Fiduciaries counted on Time Warner's assistance and support for vital medical care and financial backing. Time Warner was fully aware of its power and position in dealing with Sang Lan, her parents and her Fiduciaries after the accident.

85.     To induce forbearance on the part of Plaintiff and her Fiduciaries, Time Warner made a

---

[8]  In 2003, the vault horse was redesigned and repositioned so that it no longer sits in horizontal position.

public announcement through press releases as follows:

a.      [on who will take financial responsibility] "We have several levels of insurance that are part of this tragedy that will take care of immediate medical needs. I can't speak to the long-term, but it is our commitment to do what we can. As I said, Ted Turner and Gerald Levin are both concerned. We had a lot of insurance that will provide adequate care for Sang Lan." (Highlights and emphasis added). [Michael Plant, President of 1998 Goodwill Games. Sang Lan Press Conference July 22, 1998, Page 2: Paragraph 6]; a true and correct copy of the said press releases by Time Warner is attached hereto and incorporated by reference and marked as Exhibit F (Sang Lan Press Conference July 22, 1998, Page 2: Paragraph 6).

b.      Q: "Have you, in your corporate structure, discussed how far Goodwill and Turner and Time Warner's responsibility extends in this case not necessarily financially, but emotionally and morally?"   Dr. Schiller (President of Time Warner): "Well, from the Chairman of Time Warner Gerry Levin to Ted Turner, the Vice Chairman, my boss Terry McGalick and throughout the company, Richard Dressler, the Chief Financial Officer, they all have been acting in most supportive and sympathetic way. They offered to assist in any way possible. What we don't want to do is to take away the focus away the focus away; from the care that she is getting right now and you can be assured that this corporation and hand in hand with US Gymnastics Federation, as well as the International Federation will do everything within our power to ensure that Sang Lan's (financial) future is secured." [Dr. Harvey Schiller, President of Time Warner, Inc. Turner/Goodwill Games Press Release, July 24, 1998, page 2: paragraph 5], a true and correct copy of the said report is attached hereto, incorporated by reference, and marked as Exhibit G (Turner/Goodwill Games Press Release, July 24, 1998, page 2: paragraph 5). (Highlights and emphasis added).

c.      "In terms of our organization, we will do all we can to make sure that Sang Lan and her family are accommodated in the best possible way," said Harvey Schiller, president of Time Warner, the organizers of the games. "We are not out to exploit this. Our focus is on today. We want to get her the best possible care," Schiller said Friday in New York. He said the top executives at Time Warner' parent company of Time-Warner Inc., including chairman Gerard Levin and Goodwill Games founder Ted Turner, "are united in support of her." "You can be assured that the corporation, along with USA Gymnastics and the international gymnastics federation, will do all within our power to see that her future is secure," he said. CNN/Sports Illustrated 7/24/1998 AP reports, a true and correct copy of the said report is attached hereto and incorporated by reference and marked as Exhibit H (Sports Illustrated: Paralyzed Gymnast's Parents Begin Sad Journey To Her Bedside. 7/24/1998. AP Reports).

d.      In response to question concerning Sang Lan's future, Dr. Brock Schnebel, Chief Medical Officer, Goodwill Games 1998 stated: "Now that her surgery has been performed. She has a long way to go to further recover from this. There will be a long period of rehabilitation so that different issues have to be considered. The surgery isn't the biggest part of this, there is a lot more to come. Mike Plant of the Goodwill Games,

Turner Broadcasting, and Time Warner, the parent company, has reassured me, as the head physician for the Goodwill Games, that they will do everything in their collective power to provide the necessary resources to continue her care. So we can feel comfortable that we have done everything we can for her." [Dr. Brock Schnebel, Chief Medical Officer, Goodwill Games 1998. Turner/Goodwill Games Press Release, July 26, 1998, page 3: paragraph 1], a true and correct copy of the said report is attached hereto, incorporated by reference, and marked as Exhibit I (Turner/Goodwill Games Press Release, July 26, 1998, page 3: paragraph 1).

e.      At the time of the accident, Goodwill Games President Michael Plant said her family "won't have to worry about digging into their pockets to help their daughter in any way." Mr. Plant further stated that he personally on behalf of Sang Lan solicited contributions from the Goodwill Games corporate sponsors. [Injured Gymnast: Turner Reneged, New York Daily News, Bill Egbert 06/03/1999]." (Highlights and emphasis added), a true and correct copy of the said report is attached hereto, incorporated by reference, and marked as Exhibit J (New York Daily News, Injured Gymnast: Turner Reneged. 06/03/1999. By Bill Egbert).

86.     Time Warner made the above promises, which it should reasonably have expected to induce forbearance on part of Sang Lan or her Fiduciaries, and which did induce such forbearance because Sang Lan refrained from bringing lawsuits or asserting her rights in exchange for the promises made by Time Warner.

87.     Time Warner also made it clear to Sang Lan and her Fiduciaries that the medical care and support would not be available if it was sued over negligence. Instead, when questions were raised about the financial future of Sang Lan, Time Warner affirmatively stated to the public that "Sang Lan's future is secured" and that Sang Lan's parents need not dig into their pocket to help their daughter, through media press releases or other means of communication.

88.     On information and belief, Time Warner or Ted Turner or his agents or employees also communicated to the Chinese team leaders and others in the government of their financial commitments or support to Sang Lan.

89.     When the limelight was on Time Warner, it provided assistance and financial support while Sang Lan was receiving treatment in the United States. Time Warner publically declared

that it provided support and assistance to Sang Lan or Sang Lan's parents. To the world, Time Warner publicized their efforts to get Sang Lan's parents to the United States. Time Warner stated that it paid for Sang Lan's parents' travel expenses.[9] However, as of the date of the filing of the Compliant, Time Warner refused or failed to disclose the extent of the assistance and if and why such assistance was terminated.

90.   Sang Lan was led to believe that Time Warner's support was through its contribution to a relief fund set up for her benefit or some other arrangements made between her Fiduciaries and Time Warner. The Fiduciaries did not and had not accounted for support or benefits received on behalf of Sang Lan but categorically denied having received any donations form Time Warner.

91.   When questioned about its commitment and promises, Time Warner publicly stated that it made contributions to the Fund and its executive personally solicited contributions from the Goodwill Games sponsors. Time Warner reiterated its pledge and commitment "to provide all possible resources to secure the [Sang Lan] family's future." It also stated that it was working out the arrangement with Sang Lan's representatives, a true and correct copy of the said statement is attached hereto, incorporated by reference, and marked as Exhibit K (Sports Illustrated: Surgery A Success, But Chinese Gymnast Unlikely To Walk. AP: 7/26/1998).

92.   Time Warner publically announced that it actively solicited donations and that it donated money to Sang Lan or Sang Lan's Fund.

93.   At all times relevant, Time Warner benefited from Sang Lan's tragedy by covering her recovery and utilizing it as good publicity.

94.   Time Warner and Fiduciaries gave conflicting statements as to the donations to the Fund.

---

[9]   According to the Lius, Time Warner's statements were incorrect in that Time Warner demanded and received reimbursement of the travel expenses it allegedly paid for Sang Lan's parents. Fiduciaries alleged that even though Time Warner publicly promised to pay for Sang Lan's parents travel costs, Time Warner later demanded and received reimbursement from the Fund for any advances Time Warner paid for Sang Lan's parents' trip.

95.     Time Warner recently took the position that it had made no promises to Sang Lan's Fund but did not mention its promises or obligations to Sang Lan and Sang Lan's family.

96.     Sang Lan made demands that Time Warner honor its promises, either through her Fiduciaries or by her counsel, which Time Warner ignored or refused to address the issue.

*The Fiduciaries*

97.     At the time she was injured, Plaintiff was a minor and an unsophisticated girl. She spoke no English and was paralyzed from waist down. Before the accident, she underwent rigorous training as a professional athlete while growing up in a secluded and sheltered sports school in China. Up until this point in her life, all she was familiar with was training for gymnastics. After the accident, although the public gave her encouragement and showed great concern, she was alone and helpless in a foreign country.

98.     On or about August 25, 1998, Sang Lan's parents arrived in a state of shock. Sang Lan's parents were stricken with grief and overwhelmed by the tragedy. They did not speak English, had limited education and no resources, and were helpless in a foreign country. This was first time travelling out of their hometown. They were incapable of handling Plaintiff's affairs or matters in the United States. Sang Lan and her parents were very dependent on whomever the Chinese leaders designated.

99.     The Chinese team leader introduced Defendant Gina Liu and her husband, K.S. Liu to Sang Lan's parents as Sang Lan's designated "guardians". Gina Liu was introduced as the Honorary Vice Chairwoman of the Chinese Gymnastic Association and K.S. Liu the Honorary Vice Chairman of the Chinese Swimming Association. To the parents and Sang Lan, the Lius were the leaders of Chinese gymnastics. The Chinese team leaders selected and appointed the Lius as "guardians" to handle all matters related to Sang Lan. According to the Lius, because

they were doing business and making money in China, they were willing to answer the call of the government. The Chinese Gymnastic Team believed that the Lius, in their mid 50s, were suitable "guardians" because they had close ties with and business in China; that they were fluent in English; that they communicated well with Time Warner and other organizations; that they appeared to be knowledgeable and well versed in American law and customs. The Chinese Team leaders placed their trust in the Lius by leaving a minor with special needs in their care. They were led to believe that the Lius were responsible and trustworthy. The emerging celebrity status of the teenage girl would only enhance their standing, reputation and had incidental beneficial effect to those who were perceived as Sang Lan's handlers or guardians.

100.    The Chinese team leaders told Sang Lan and her parents to place their trust in the Lius and follow their directives and instructions; that Defendant Gina Liu and her husband would take over and exercise control over Sang Lan's affairs. Thus, Sang Lan and her parents regarded Gina Liu as one a position of authority. Sang Lan was to "obey Gina Liu because Gina Liu was one of our guys on the team. She can be trusted." The press release to the public by the Chinese team referred to the Lius as "guardians" for Sang Lan.

101.    At all times relevant, the hospitals, Time Warner, media and public at large accepted and dealt exclusively with the Lius as Sang Lan's guardians appointed by the Chinese team leaders.

102.    At all times relevant, the Lius held themselves out and acted as Sang Lan's "guardians", gained Sang Lan and her parents' confidence and exercised complete control and influence over Sang Lan in all aspects of her personal life, including but not limited to medical treatment, public appearances, educational needs, receipt of care, transportation, living conditions, interviews with the press, visits with doctors and medical facilities. As Sang Lan's handlers, the Lius carried with them the fiduciary duty and responsibility to take care of Sang Lan's affairs with care, diligence

and the utmost loyalty, fidelity and integrity. As fiduciaries, the Lius and Mo owed Plaintiff a duty of loyalty, good faith and the duty to place Sang Lan's interest above their own and duty not to profit from their positions as Sang Lan's handlers, "guardians" or agents.

*The Attorney*

103.    Mo was former attorney for Sang Lan and also acted as attorney for the Fund.

104.    During the same time, Mo was attorney for the Lius.

105.    The Lius introduced Mo to Plaintiff as one of the most prominent lawyers in the United States and well known in the Chinese community. Hugh Mo and his law firm were introduced by the Lius to Plaintiff as the lawyer who handled legal matters for Sang Lan or Sang Lan's Fund.

106.    The Lius frequently consulted Defendant Mo and Mo Law Firm on all matters related to Plaintiff, including but not limited to whether or not to sue Time Warner and others for permanent injuries suffered by Plaintiff, interaction with the U.S. public, and the Fund set up for her.

107.    Mo and Mo Law firm held themselves out and acted as the legal representatives for Sang Lan in functions, meetings, and events in honor of Sang Lan and Mo was introduced as the attorney taking care of legal matters for Sang Lan.

108.    At all times relevant, Mo or Mo Law firm did not discuss and had never discussed with Sang Lan the subject of actual and/or potential conflicts of interest on account of Mo's representation of the interest of the Lius and Sang Lan. Mo and Mo Law Firm as her lawyers never told her or requested her to seek independent counsel.

109.    Sang Lan either directly or through her "Fiduciaries" frequently consulted with Mo, who rendered legal advice on matters related to Time Warner, to the Fund and any and all legal matters, pertaining to Sang Lan. Specifically, by way of example and not being exhaustive, Sang

28

Lan or her representatives or handlers consulted Mo or Mo Law Firm on potential claims against organizers of the 1998 Good Will Games; on damages from injury; on running the financial affairs of the funds; on passport issues; on the legal status of the fund; on media handling; on studying in the United States by extending her visa status; on benefits to be obtained under the insurance policy.

110.    In addition to matters related to the Fund, Mo assisted and provided Plaintiff with professional services, including but not limited to: handled the CNN interview preliminary legal matters; liaised with the medial and legal professionals from the United States regarding treatments, fundraising events, compliance with the laws by the Fund.

111.    Sang Lan sought legal advice from Mo from 1998 through July 2008 by asking about who to sue, what evidence to gather and what records she could get from the Lius. Sang Lan firmly believed that Defendant Mo was the only person she could depend on in continuing to press a claim or attempt to resolve an ongoing, identified legal problem with Time Warner and others.

112.    Sang Lan, as beneficiary of the Fund stood in a fiduciary relationship with Mo with respect to her Fund in the U.S. She trusted Mo to look after her interest, to avoid conflicts of interest, and to make sure the laws and rules were complied in managing her Fund.

113.    Mo's relationship with Plaintiff and the Lius was tainted by Mo's failure to disclose actual and/or potential conflicts of interest, and his action and/or inaction with respect to looking after his client's best interest.

114.    Defendant Mo knew Sang Lan counted on and relied on his knowledge of the law, expertise, and skill in advising her on these legal matters.

115.    Presumably, Defendant Mo rendered a legal opinion to Sang Lan's handlers or agents and

advised them on management of the Fund and ensured the compliance with the applicable laws pertaining to the Fund. On information and belief after investigation and inquiry, Mo failed to maintain records and an accurate account of the Funds, such that Mo's representation fell short of acceptable legal standards for a competent lawyer handling matters of this type.

116.   Sang Lan had a right to repose confidence in and rely on Mo' professional ability, diligence, and good faith, and realistically could not be expected to question and assess the techniques employed or the manner in which the services were rendered by Mo.

117.   At all times relevant, Mo failed to disclose actual and/or potential conflicts of interest; never advised Sang Lan to seek outside counsel; and never counseled Sang Lan about the actual and/or potential problems in advising her on the lawsuits against others and possibly against his other clients.

118.   Mo and Mo Law Firm at times material held themselves out as Sang Lan's attorney or attorney for the Fund while failing to disclose actual and/or potential conflicts of interests and while pursuing affirmative steps to benefit himself at the expense of that client including, but not as a limitation, being conspicuously identified as the attorney for Sang Lan, a celebrity in China.

119.   Sang Lan was not notified that the attorney-client relationship with Mo had terminated or the date of such termination. As such, the attorney-client relationship continued through until April 2011.

*The Fund*

120.   On information and belief, a not-profit charity fund commonly known as the "Good Will Funds for Sang Lan" was established for the benefit and relief of Plaintiff after the accident in 1998, pursuant to the laws of the State of New York (the "Fund").

121.   Shortly thereafter on dates unknown to Plaintiff at this time, the Lius took over the

control of the Funds and used the Lius' home address located at 17 Whippoorwil Road, Armonk, New York 10504 as the Fund's designated place for donations and contributions.

122.    The Lius consulted and discussed with Mo on all matters related to Sang Lan. Mo provided continuous legal service or other professional services to Sang Lan or to the Fund. Mo attended managers' or trustees' meetings for the Fund, either as attorney for the Fund or as a manager or trustee of the Fund. Mo further prepared documents pertaining to the Fund and ensured the compliance of the Fund with the applicable laws.

123.    From the inception of the Fund through July 2008 and at all times relevant, Lius and Mo attended and supervised meetings and fund raising events for the benefit of the Fund. Mo attended and was introduced at such meetings and fundraising events as counsel or attorney for the Fund or attorney representing Sang Lan's interest. Due to media attention on Sang Lan, identification with or as counsel or representative for Sang Lan had its attending or beneficial consequences.

124.    Time Warner published the donation address and assisted in soliciting money on behalf of Plaintiff. Plant statements, see Exhibit J (New York Daily News, Injured Gymnast: Turner Reneged. 06/03/1999. By Bill Egbert) above. The address was the Lius' home address or a postal office box controlled by the Lius.

125.    At all times relevant, the Fund received donations from the public, including but not limited to donations by the Chinese American community in the United States. Plaintiff was told that some of the donations to the Fund were deposited with Abacus Federal Savings Bank in New York ("Abacus Bank"). The Lius did not disclose whether they received other donations or that they pursued anyone who was soliciting donations in Plaintiff's name.

126.    In meeting with Sang Lan and subsequent thereto, and through telephone and other

means of communication through interstate commerce, the Lius made the following representations to (or omitted to mention to) Plaintiff:

a. That the Fund was registered with federal or state governments as a non-profit organization or fund; That the Fund was set up as a not for profit organization and was properly registered with tax exemption status with Internal Revenue Service or other government agencies;

b. That the Lius or Mo or Mo Law Firm as attorney for Sang Lan or for the Fund were making sure that the Fund was in compliance with the laws, including but not limited to rules and regulations governing the Fund;

c. That rules and regulations pertaining to the Fund (requiring record keeping, regular reporting or filing of returns) were followed or complied with;

d. That there was no conflicts or interest, real or potential, between the Lius and Sang Lan or the Fund;

e. That the Lius were not managers of the Funds but voluntarily assumed the responsibility running the Funds as a charity set up by the Lius with legal assistance by Mo or Mo Law Firm;

f. That the Fund was managed by a board of trustees and the Lius were not trustees or managers of the Fund; the Lius were merely "middleman" whose would remit to Plaintiff interest accrued on the bank accounts of the Fund;

g. That neither Sang Lan nor Sang Lan's parents would participate in any form in the supervision or management of the Fund because they were not U.S. citizens;

h. That the Lius did not use or apply or disburse money from the Fund to pay for Sang Lan or Sang Lan's relatives' travel expenses or housing construction costs; that the Lius paid for Sang Lan or Sang Lan's relatives' travel expenses, housing construction costs and with the Lius' personal money.

127. The Lius convinced Plaintiff that they had no obligations to Plaintiff to account for the Funds.

128. Plaintiff believed what the Lius told her. Unknown to Plaintiff, the foregoing representations made by the Lius were untrue and were made to induce Plaintiff to place her trust in them and to preclude any independent inquiry by her.

129.   As trustees or managers of the Fund, Fund Managers owed a fiduciary duty to Plaintiff to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in similar positions would use under similar circumstances. This duty of care, included, but was not limited to, the following:

a.   To place the beneficiary's interest above the Fund Managers' or trustees' own and to administer the trust solely for the beneficiary's benefit;

b.   To exercise the same degree of care, skill and caution that a reasonably prudent person would exercise in dealing with his or her own property;

c.   To be loyal and honest with beneficiary, dealing with beneficiary in good faith without concealing material information or making false or misleading representations;

d.   To ensure that the Fund is transparent and managed under supervision of the appropriate authorities; that the Fund is in compliance with New York Laws governing the charitable funds, including but not limited to: taking reasonable and necessary steps or actions to properly register the Fund, to file annual or other periodic reports with the appropriate reporting authority or Charities Bureau of New York or Internal Revenue Service; to avoid or minimize tax exposure or liabilities to the Fund or the beneficiary;

e.   To keep clear and accurate records and to provide regular accounting to the beneficiary;

f.   To disburse money from the Fund to Plaintiff when requested;

g.   To segregate the assets of the Fund from the trustees' own assets, and to clearly allot such funds as belonging to the Fund;

h.   To prudently invest the trust funds to make the trust productive for the income beneficiaries.

130.   Except a few documents supplied to Plaintiff in connection with her application for visa

to see her doctor in New York, there were no documents related to the Fund ever provided to Plaintiff.

131.    Thus, Fund Managers were able to conceal the true status of the fund and failed or refused to provide periodic reports or financial records of the Fund, to account the amount of donations received, the expenditure of the money, receipts and disbursements of the aforementioned Fund.

132.    After the alleged balance was transferred to Plaintiff, Plaintiff discovered that some of the past representations by the Lius about the Funds were misleading, contradictory, dishonest or confusing.

133.    By way of example, the Lius said that they paid approximately $30,000 for travel costs for Plaintiff and her parents with their personal money. The Lius later stated that they disbursed from the Fund to unknown persons or entities approximately $30,000 for reimbursements of travel costs of Plaintiff and her parents. Both versions of the Lius' statements could not be true at the same time.

134.    Due to the fiduciary relationship that existed between Sang Lan and Fiduciaries, Sang Lan was afraid to ask questions about the Fund, and afraid to do anything which would be perceived by the Lius as 'ungrateful' or challenging their authority or their trustworthiness.

135.    At all times relevant, the Lius did not give records or reports and did not give Sang Lan or her parents any accounting of the donations (who had donated and in what amounts) to the Fund.

136.    After the alleged remaining balance of the Fund was turned over to Sang Lan in July 2008, no accounting records or reports or returns were ever handed over to Sang Lan or her parents.

137.  By way of example, Plaintiff was not provided with copies of corporate documents pertaining the Fund, such as articles of incorporation, exemption papers, corporate minutes or bylaws; registration papers filed with reporting agencies, tax returns filed on behalf of the Fund; accounting records, evidencing amounts donated, amounts disbursed, or amounts invested and financial statements or balance sheets of the Fund.

138.  Fund Managers have full access to the account information related to deposits and withdrawals of the Fund deposited with Abacus Bank; full access to checking, or saving accounts maintained by the Lius or others yet to be identified; and had possession and control over bank records, financial records and other documents related to the Fund.

139.  Plaintiff asked the Lius for records. The Lius directed her to Abacus Bank.

140.  The Abacus Bank refused Plaintiff's access to any and all information related to the Fund and directed Plaintiff to contact Mo as attorney for the Fund for authorization and release of the information.

141.  As of the date of filing of this Complaint or Amended Complaint, Sang Lan was not given any accounting, report, or returns or any documents related to or concerning the Fund.

142.  Fund Managers knowingly breached their fiduciary duties as follows (non exhaustive list):

    a.  Failed or refused to account for the funds received or disbursed;

    b.  Failed or refused to keep complete and accurate accounting records for the Fund;

    c.  Failed or refused to provide monthly or quarter reports;

    d.  Failed or refused to provide corporate or other documents related to the Fund;

    e.  Failed or refused to inform Plaintiff whether the Good Will for Sang Lan Fund was registered with Charities Bureau of New York or whether the Fund was exempt from

registration;

f.   Failed or refused to comply with registration rules as required by the Charities Bureau of New York;

g.   Failed or refused to file any tax returns and provide copies to the Beneficiary;

h.   Failed or refused to provide minutes of activities of trustees;

i.   Comingled or causing the comingling of the funds of the Fund with the Lius personal bank accounts;

j.   Failed or refused to invest the funds of the Fund to make the Fund productive for the beneficiary.

k.   Failed or refused to place the beneficiary's interest above their own, or properly used or applied funds from the Fund.

l.   Failed or refused to exercise the same degree of care a reasonably prudent person would in their position when discharging their duties as the Fund Managers.

143.   Since there was no information evidencing a list of donors or contributors with the amount donated identified, and donations and contributions were solicited to be sent to the Lius' home or a post office box controlled by the Lius, no one knows the actual amount of donations or contributions delivered or sent to the Lius' home or to their possession by virtue of their holding out to the world their status as "guardians", managers or trustees of the Fund.

144.   Therefore, the amount of money due from to plaintiff is unknown to plaintiff and cannot be ascertained without an accounting of the Fund.

*The Control*

145.   Plaintiff, a high-level quadriplegic (C4 and higher), needs constant care and assistance in activities of daily living, such as getting dressed, eating and bowel and bladder care. Improper

bladder care will result in infection, kidney failure and life threating complications. Simple items, like safe and quality catheter tubes, not readily available in China, become Plaintiff and her parents' top concern. The Fiduciaries forbade Sang Lan to bypass them and contact anyone in the U.S. Sang Lan was never provided with contact information of her doctor, insurance company's or medical supply company's contact person in the U.S. Plaintiff and her parents refrained from contacting health care providers and insurance carriers and agents for fear and concern that doing so would interfere with the Fiduciaries and jeopardize claims, payments, insurance benefits, and access to medicine and medical supplies controlled by the Fiduciaries.

146.    Plaintiff Sang Lan resides in Beijing. It is not easy for a quadriplegic to travel because of her medical conditions, in addition to other problems such as limited resources, making travel plans on short notice, and conflict with on-going treatment plans. According to her doctor, she is a high level C-6/C7 quadriplegic, who struggles on a daily basis with complications associated with the injury. If not carefully monitored or treated, the complications may cause additional injury or life threatening conditions. Due to the loss of feeling or function in the extremities and torso, quadriplegia can contribute to a number of medical complications including pressure sores (decubitus), thrombosis, pneumonia, inflammation, Autonomic dysreflexia (AD),[10] Bladder or urinary infections, and other nerve-related complications.

147.    If AD is left untreated, it is a potentially life-threatening condition. The body's attempt to control blood pressure will severely decrease the heart rate. This, combined with uncontrolled

---

[10]   **Autonomic dysreflexia:** Autonomic dysreflexia (AD) is a condition that can occur in anyone who has a spinal cord injury at or above the T6 level. It is related to disconnections between the body below the injury and the control mechanisms for blood pressure and heart function. It causes the blood pressure to rise to potentially dangerous levels. AD can be caused by a number of things. The most common causes are a full bladder, bladder infection, severe constipation, or underlined pressure sores. Anything that would normally cause pain or discomfort below the level of the spinal cord injury can trigger dysreflexia.

high blood pressure, can be fatal. Patients should monitor bladder output and should maintain a regular bowel program that fully empties the bowels.[11]

148.     Kidney (renal) failure used to be the leading cause of death for individuals with a spinal cord injury. The loss of normal bladder function after spinal cord injury places one at increased risk for urinary tract infection (UTI), regardless of the type of bladder management used. Urinary tract infection remains the most common secondary medical complication following a spinal cord injury and it is certainly one of the most costly.

149.     Physiotherapy and vigilant self-observation and proper care, may aid in helping to prevent future complications and to mitigate existing complications.

150.     All quadriplegics have or have had some kind of finger dysfunction. So, it is not uncommon to have a quadriplegic with fully functional arms with non-functioning fingers.

151.     After the accident, Sang Lan lost ability to obtain gainful employment because of her disability. She was in need of and depended on whatever money meted out by the Lius to supplement her income in China in order to survive in China.

152.     Sang Lan also depended on the Lius for their handling, procuring, dispensing and shipping her medicines and medical supplies prescribed by her doctors in the United State. It was paramount that Sang Lan should not be cut off from the medical supplies by the Lius. Therefore, Sang Lan and Sang Lan's parents did everything possible to avoid antagonizing the Lius in any way.

153.     The Lius continued to exercise influence, control over payments from the Fund on or about July 2008. The Lius and Mo continued to act as Fiduciaries for the Fund until they turn

---

[11] "Bladder Care and Management" By: RRTC in Secondary Complications in SCI at the University of Alabama at Birmingham, Dept. of P M & R.

over the termination papers, which has yet to occur.

154.   The Lius did not relinquish their control over the meting out of the medication and medical supplies from the insurance company until April 2011.

155.   The Lius and Mo used Sang Lan whenever the relationship benefitted them, such as holding themselves out to the general public and to the exclusion of all others as the Chinese government appointed "guardians", agents, representatives, lawyer, legal representative, media spokespersons. The Lius and Mo made sure that they were identified as Sang Lan's official Chinese government trusted "guardians", when making appearances with former presidents, celebrities, during TV interviews and in all functions and events from which they could gain fame and benefits. They also used Sang Lan's celebrity status, professional persona, name, image, or likeliness to advance or enhance their names, images, and to promote their business or solicit business opportunities. By way of example, the Lius made audiotapes to promote their names, their business and their cause; required Sang Lan's appearances at their promotional events to promote their lottery business in the name of benefiting disabled persons.

156.   At all times relevant, defendants exercised the exclusive control over Sang Lan's money and medicine or medical supplies to ensure they would have continuous control over Sang Lan's affairs and to prevent Sang Lan from challenging them on any matter. They controlled Sang Lan's media events to their benefit. They prevented Sang Lan from making any "unauthorized" contacts with others and seeking advice or help from others while in the United States.

157.   At all times relevant, while under the Lius' influence and control, the Lius discouraged Sang Lan from pursuing educational opportunities in the United States; they rejected on her behalf scholarships offered by universities in the United States; restricted Sang Lan's access to information related to her funds; never once provided any accounting or report on her money or

property; told her there were no expenses allowed for home care aid when in fact the insurance policy most likely covered the aid or care; otherwise acted in bad faith or irresponsibly in dealing with her funds and her insurance claims.

158.     The Lius had exclusive control and contact with the insurance claims. However, they refused to hire a licensed nurse to carry out the critical and important task of performing necessary catheterization, even though such expenses were or would be covered by the insurance policy. Instead, without license and without consent, Defendant K.S. Liu performed catheterization on Sang Lan on many occasions.

159.     Sang Lan placed her complete trust in the Lius and Mo, as Fiduciaries and her attorneys, and counted on her Fiduciaries to be loyal to her, acting in her best interest and in good faith in dealing with her property or money.

160.     At all times relevant, the Fiduciaries had exclusive and tight control over Sang Lan's money, her medicines and medical supplies vital to her health and well-being. Sang Lan needed the funds, and more importantly and critical to her health, the medical supplies from the United States.

161.     The Lius and Mo knew that Sang Lan relied on them for making sure that there is no interruption or interference with the medicines and medical supplies needed by Sang Lan to fight medical complications. The Lius and Mo knew their position and power over Sang Lan.

162.     Sang Lan was not in a position to challenge the Lius and Mo because she needed to make sure that the vital medicine and medical supplies were forthcoming and available through the Lius and Mo. She also needed a monthly stipend to sustain a modest living.

163.     As long as the money and medicines were within the exclusive control by the Lius and Mo's legal service to the Fund continued on a regular basis, without any clear indication or

expression by Mo to the contrary, the fiduciary relationship continued to exist.

164.    Given the control and influence over Sang Lan by the Lius, Sang Lan was afraid to ask questions about the Fund, and afraid to and therefore refrained from do anything which would be perceived by the Lius as interfering with their work or duties, thus jeopardizing or interrupting the vital supply of medicines and medical supplies. Indeed, when she finally asked the Lius about the Funds, about the records, the Lius attacked her as an "ungrateful", "lazy" and "greedy", a comment confirming Plaintiff's fear or reluctance to challenge her Fiduciaries.

165.    The Lius concealed, misrepresented and acted in bad faith in carrying out their duties as Fiduciaries. Moreover, this tightly controlled relationship, concealment or fraudulent representations of material facts precluded Sang Lan from making inquires or conducting any investigation on her own. The Lius exercised exclusive control over Sang Lan's money and medication. Sang Lan could not make independent decision even after she reached the age of 18. Therefore, the statute of limitation, if any, on her claims against the Lius will be tolled.

166.    Regardless, the earliest opportunity to discover improprieties was when Liu, Sie and Mo handed over the money in July 2008. The initial complaint was filed in April 2011, within the three (law) or six (equity) years of the statute of limitation on actions based on claims for breach of fiduciary duty.

*The Betrayal*

167.    Although the Lius were the "guardians" or agents appointed by the Chinese Gymnastic Team for Sang Lan in 1998, they did not fulfill their duty owed to Plaintiff, and demonstrated a lack of ability, sense of honor or duty to properly dispense their duty owed to Plaintiff.

168.    On information and belief after investigation and inquiry, as Fiduciaries, the Lius or Mo did not fulfill or discharge their fiduciary duty to diligently follow through with Time Warner, to

work out the specifics of the oral contract or agreement with Time Warner to secure Sang Lan's future. Lius and Mo concealed from and never kept Sang Lan informed of the dealings with Time Warner.

169.   On or about July 2008, Fiduciaries handed over the alleged balance of the Fund without any accounting or records. Fiduciaries did not provide any reports, account for the donations, expenditures, and financial management of the Fund in any way; nor did they make any record available to Plaintiff concerning the handling of the Fund.

170.   Plaintiff has a fundamental right to receive a complete and accurate accounting from their trustee.

171.   Yet, Sang Lan was not given any of the corporate records such as minutes of the meetings of the Trustees, Reports, Accounting, Bylaws governing the Fund, Annual reports to NYCB, Regular reports to Plaintiff, or investment records.

172.   Plaintiff is without knowledge as to who has donated, the amounts of such donations, the sources and details of funds or donations, the expenditures and expenditure authorizations, the investment of the Fund, the supervision and management of the Fund, the identities of all trustees or managers or professionals with the Fund; the locations of all bank accounts or related financial records related to moneys coming into the Funds.

173.   Plaintiff attempted to obtain those documents to no avail.

174.   Mo and Mo Law Firm did not disclose to Plaintiff that there was a conflict of interest because Mo and his law firm were the Lius' attorney while Mo and his law firm also represented Plaintiff individually as well as either as attorney or manager or trustee of the Goodwill Fund.

175.   On information and belief and at all times relevant, the Lius used Plaintiff's celebrity status, her name, her likeliness, image, reputation, in promoting their name, their business for

commercial gains or profit, without obtaining consent or authorization from Plaintiff. The Lius did not disclose to Plaintiff nor did they account for commercial activities or profits from using Plaintiff's name, likeliness, images, reputation and celebrity status for their own profits and gains.

176.   Fiduciaries did not comply with requirements of New York State concerning the establishment, registration, reports, accounting, and disclosure requirements about the Fund.

177.   Due in significant part to the continuing relationship of trust and confidence engendered by the attorney-client relationship between Plaintiff and her agents or trustees, the Lius and her attorney, Mo, and due also to the Lius and Mo's willful concealment of the true status of the Fund, the operation of the Fund, Plaintiff has not yet learned of the extent of their monetary injury resulting from the breaches of duty alleged above.

178.   As a result of the breaches of duty alleged above, Plaintiff has been damaged in an unknown amount, which will be proven at trial.

*The Privacy Invasion*

179.   Between July 1998 and continuing, on information and belief, to the present, at a time or times presently unknown to Plaintiff but at all times relevant and throughout the relationship, the Lius have used and continue to knowingly, and without having first obtained consent of or authorization from Plaintiff, use or appropriate Plaintiff's celebrity status, professional persona, name, photographs, voice, images, or likeness for the specific purpose of advertising, marketing and promoting their business, reputation, publications, books and other interest.

180.   By way of example (the list is non-exhaustive), Defendants Liu and Gina Liu have used or appropriated Plaintiff's celebrity status, professional persona, name, photographs, voice, images, or likeness in their brochures, music CDs, publications, blogs, advertisements, trading activities, business promotion events, a true and correct copy of sample of such use or

appropriation or misappropriation are attached hereto and incorporated by reference and marked as Exhibit L (the Lius music CDs, blogs).

181.    The Lius owed to Plaintiff a fiduciary duty such that the Lius were required to act with the utmost loyalty to Plaintiff and not use or otherwise appropriate Plaintiff's celebrity status, professional persona, name, photographs, voice, images, or likeness and information obtained during the beneficial fiduciary relationship for their own gain or profit or fame without permission and without properly accounting for them.

182.    The Lius actively concealed from Plaintiff their use of Plaintiff's celebrity status, professional persona, name, photographs, voice, images, or likeness to promote their business or their fame.

183.    Furthermore, in 2012, Defendants Liu announced their plans to publish books or other pamphlets, which will contain or use Plaintiff's celebrity status, professional persona, name, photographs, voice, images, or likeness and information gained during the relationship.

184.    As a result of the Lius' violations of her right of privacy and breach of fiduciary duties to Plaintiff alleged above, the Lius gained the advantage of earning and has earned substantial fortune, compensation and fame.

*The Defamation*

185.    By 2011, it was apparent that Plaintiff was no longer satisfied with the Lius' inconsistent and misleading responses to her inquiries after the Lius closed the Fund without accounting for it. A resolution of the disputes privately was no longer possible because of Defendants dogged refusal to account for their acts or conduct. On or about January 2011 and through the date of filing of the complaint, Defendant Liu and Gina Liu made the untrue statements to the public, including but not limited to the following:

    a.  That "San Lan is too lazy. Can't get a job. I helped her to get the job at Star TV, through my connections with high rank Chinese government officials, but she lost that job later because she didn't want to do any work."

    b.  In the same blog, the Lius also made a statement to public that: "San Lan is so lazy, that she was trained to pee on her own, but she didn't [and] I had to use a tube to assist her to pee."

    c.  The Lius also made the statements "they [Plaintiff and her friend] want to apply for political asylum in America"; implying the filing of plaintiff's complaint against the Lius was one of Plaintiff's basis or claim seeking political asylum in the U.S.;

    d.  Gina Liu also made similar remarks and published to the public by using internet that "she [the Plaintiff] won't do these things ["bladder and bowel movements] by herself; she entirely depend on others (alluding to her laziness). If no one helps her, she will die. This is what we cannot get over these years. Perhaps, we gave her too much assistance, if this could be counted as our fault. She now has developed a bad habit of dependency or relying others do things for her. This is not a good thing. We hope she becomes self reliance soon and does not rely on other any more".

True and correct copies of some samples of Defendant Lius' blog and statements are attached hereto and incorporated by reference herein and marked as Exhibit M (the Lius' Defamatory Statements).

186.   The Lius' statements were published on the blogs and broadcast over the internet by the Lius and re-broadcast by others, including Does 1-30, from January through May 2011. Defendant Liu and Gina Liu together with Does 1-30 communicated with Plaintiff anonymously through a website maintained and managed by Sinovision. In particular, Defendant Liu's statements were published in his blog on Sinovision's blog site, devoted mostly if not exclusively to spewing vulgar, obscene, and derogatory remarks or blogs designed to cast Plaintiff in a false light. Sinovision's site was dominated by the Lius and the Lius' alleged "supporters", who derived pleasure in 'trolling' or 'flaming' by posting inflammatory, demeaning, insulting, and harassing comments or messages with the primary intent of provoking

readers into an emotional response and to harass, annoy, threaten or alarm Plaintiff.

187.    The Lius' statement that Plaintiff's filing of a lawsuit against them were Plaintiff's attempts to seek political asylum was consistent with their online message of "the farmer and snake" story,[12] implying that Plaintiff in the course of "betraying" her fiduciaries, she also betrayed her country, implying that Plaintiff is a person lacking integrity, moral turpitude, and politically dangerous to her own country.

188.    Notwithstanding Liu and Gina Liu's logic, which defies common sense and decency, Gina Liu and Liu both intimated that Plaintiff, a high-level quadriplegics (C4 and higher) who needs constant assistance to perform basic simple daily tasks, was 'lazy' or lacked diligence because she could not perform a medical necessary procedure that would normally be performed by a nurse or medical profession to avoid life threatening complications. Unlike Liu or Gina Liu who presumably have normal bladder controls, Plaintiff, despite rehabilitation or "training" and the progress she made in physical therapy, does need constant assistance to complete simple daily tasks, which require fine motion skills and command over her arms and legs. Both Liu and Gina Liu knew and had cause to know that Plaintiff needs assistance to avoid life-threatening complications on a daily basis and such medical procedures should be timely and properly performed with the assistance of medical staff or trained professionals.

189.    Furthermore, despite the fact that Defendant Liu was not a licensed nurse or medial professional; that his wife or Plaintiff's mother was present and available, and that Liu was performing on Plaintiff an invasive medical procedure without consent[13], Liu and Gina Liu making such false and salacious statements with information gained while acting as her

---

[12]   Alluding to the Aesop's Fable about the snake bit the benefactor who saved it from death.

[13]   Liu did not have Sang Lan's consent to do the catheterization. Sang Lan was incapable of giving consent as a minor or Sang Lan was physically helpless and was unable to give physical communication of consent.

fiduciaries has no other rational basis except with a singular design to and did in fact expose Plaintiff to hatred, contempt or to induce an unsavory opinion of Plaintiff in the minds of a substantial number of individuals in the community, in this case probably in the millions worldwide. It showed a callous if not total disregard of Plaintiff's rights, sentiment, reputation and her standing in the community.

190.    Defendant Liu's statement portrayed Plaintiff as lacking character, diligence and dedication necessary hold any profession.

191.    Liu's statements specifically imputed Plaintiff as a person of moral turpitude and to disparage her as incapable of holding a job he procured for her through his connections with high-ranking officials in China.

192.    The Lius knew that such false statements and the ensuing incendiary remarks by them and others would amount to character and political assassination. They certainly proximately caused the loss of reputation, standing in the community, income, employment opportunity and injured Plaintiff in her professional capacity and her career, ending many opportunities of employment and other prospects.

193.    From the reactions and comments left by bloggers and other commentators inflamed by the Lius on Sinovision and elsewhere on the internet, Defendant Liu and Gina Liu's blog or statements exposed Plaintiff to hatred, unleashed irrational and emotional responses from many readers and bloggers, which include the alleged "supporters" of the Lius who disrupted normal on-topic discussions by taunting and making derisive remarks and statements, and subjected Plaintiff to physical harm or attempts or threats to do the same because of Plaintiff's disability and her seeking remedies in a court of law.

*The Cyberharassment.*

194.    After Plaintiff demand for accounting of funds and her properties, and the disputes with the Lius over the Lius' fiduciary duty became public, in addition to making false and defamatory statements online, the Lius and Does 1-30 began publishing blogs and articles on Sinovision's blog site, devoted mostly if not exclusively to spewing vulgar, obscene, and derogatory remarks or blogs designed to cast Plaintiff in a false light. Sinovision's site was dominated by the Lius, Does 1-30 and the Lius' alleged "supporters", who used pseudo or fictitious names and derived pleasure in 'trolling' or 'flaming' by posting anonymously inflammatory, demeaning, insulting, and harassing comments or messages with the primary intent of provoking readers into an emotional response and more importantly to harass, annoy, threaten or alarm Plaintiff.

195.    The Lius and Does 1-30 employed tactics and trolling practices, taunting Plaintiff and her friends in an emotional response to the insulting remarks, a designed effect produced by such trolling practice.

196.    At some time, presently unknown to Plaintiff, and continuing to the present, on information and belief, the Lius and Does 1-30 knowingly and willingly conspired and agreed with the Lius and with each other to engage in a scheme to cyberharass Plaintiff with intent to annoy, intimidate, threaten and alarm Plaintiff by using with trolling and inflaming statements containing vulgar, obscene, derogatory, demeaning, insulting, and harassing remarks.

197.    The Lius and Does 1-30 did the acts and things alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

198.    Plaintiff is informed and believes and thereon alleges that the last overt act in pursuance of the above-described conspiracy occurred on or about and shortly after the date of filing of the Complaint, as the Lius and Does 1-30 continued to communicate with Plaintiff through online

blogs anonymously.

199.    On information and belief after (incomplete) investigation and inquiry, the pseudo names or online fictitious names (and English transliteration) used by the Lius and Does 1-30 include the following: Sun Ying, Zuo Ma, Maomao. They are among the persons who anonymously post salacious and disparaging statements to annoy, harass, threaten and alarm Sang Lan and her relatives.

200.    On information and belief after investigation and inquiry, the online blogger using the anonymous identity known as "Sun Ying", believed to be used by Liu, frequently incited and inflamed the online community by his incendiary and outrageous remarks designed to expose Plaintiff to hatred, contempt or to induce an unsavory opinion of Plaintiff in the minds of a substantial number of individuals in the community. Sun Ying's statement specifically decried Plaintiff as person of immoral turpitude and to disparage her as incapable of holding a job, due to laziness and greed.

201.    Several bloggers have threatened to cause physical and bodily harm to Plaintiff if and when Plaintiff visits New York.

202.    On information and belief, the Lius and several bloggers met frequently with blog administrators or executives of Sinovision to coordinate the publications of blogs.

203.    The Lius and anonymous Does continuously wrote, blogged and posted comments with malice with singular design to subject Plaintiff to public ridicule and humiliation, to ruin Plaintiff's reputation and professional career, to expose Plaintiff to hatred, contempt or to induce an unsavory opinion of Plaintiff in the minds of a substantial number of individuals in the community, and with intent to harass, annoy, threaten or alarm Plaintiff anonymously through a website maintained and managed by Sinovision.

204.    Plaintiff, her parents and her friends were victims of trolling. They are being tormented by the Lius and Does 1-30, whose activity and conduct harassed, annoyed, and threatened and alarmed Plaintiff and her family. Plaintiff and her family live in constant fear, heightened anxiety, pain, and mental anguish, subject to ridicule and humiliation as result of these salacious and insulting attacks by the Lius and Does 1-30.

COUNT ONE: BREACH OF CONTRACT (Against Time Warner)

205.    This is an action based on claims of breach of contract for damages against Defendant Time Warner, Inc. ("Time Warner")[14] in excess of $75,000 exclusive interest, costs and attorney fees.

206.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth, and further alleges:

207.    In 1999, Plaintiff was a minor.

208.    At all times relevant, Defendants Liu, Sie, Mo and Mo Law Firm (collectively "Fiduciaries") were her "guardians" or counsels advising her and acting on her behalf on matters or issues related to claims resulting from injury or accident during the 1998 Goodwill Games, the subsequent insurance claims, or claims of general nature, including dealings with Time Warner.

209.    As the sponsor and organizer of the Games, Time Warner had a legal duty to provide a reasonably safe environment, equipment, layout of equipment; to supervise the competition floor for the 1998 Goodwill Games to ensure safety and free from distractions; and was charged with the duty to provide a reasonably safe environment for the competition by the world's best

---

[14]   As used in this Amended Complaint, "Time Warner" includes, as the context permits, Turner Sports, Inc. a division of Time Warner, Inc. with its principal place of business at 1015 Techwood Drive, Atlanta Georgia 30303, 1998 Goodwill Games, Inc., or any subsidiary or affiliate companies who may or may not be named as co-defendants herein, who are organizers of the 1998 Goodwill Games held in New York.

athletes.

210.   At all times relevant, Time Warner had oversight duty to provide a reasonably safe environment to ensure that athletes could compete free from distraction or interference by others.

211.   At all times relevant, Time Warner either expressly or implicitly gave its assurances to the athletes, including the athletes from China National Team, that the environment was reasonably safe for practice and competition.

212.   Time Warner breached that duty by failing to provide a reasonably safe environment, to ensure that the competition area was free from distraction or interference, to ensure that equipment, layout of equipment, or an orderly presentation of the competition were such that it was safe for the athletes to compete; to ensure that the floor area and attending environment was reasonably safe for Plaintiff and others to practice and compete free from distraction and interference.

213.   Apparently, the competition floor under Time Warner's supervision on July 21, 1998 was not a safe environment in that Time Warner's staff did not ensure that the practice and competition was free from distraction or interference around the landing areas and that others would not be allowed to remove the mattress in the middle of a practice routine.

214.   Time Warner's breach of its duty proximately caused Plaintiff's fall or accident.

215.   Plaintiff suffered serious damages and her losses were substantial.

216.   As a world title and 1998 Goodwill Game Championship strongest contender, she had important rights to assert against many, include but not limited to bring action to seek or recover damages from Time Warner, the 1998 Goodwill Games, US Gymnast Federation, the insurance carriers, equipment manufacturers, event promoter and landlord's premises liability, the arena owners, and any and all persons or entities, which could have been liable to her for failure to

exercise due care under the circumstances.

217.    Time Warner's response and reaction to the accident made it clear that Time Warner was very concerned about its liability toward Plaintiff.

218.    On information and belief, Time Warner's made a concerted effort to conceal or deny access to any and all evidence or information, which showed, might show, would show or tended to show that Time Warner was or might be negligent by failing to provide a safe environment for athletes to practice and compete free from distraction or interference or by failing to make the competition floor safe.

219.    Whenever there was a question about Time Warner's responsibility, Time Warner carefully diverted the attention away from the potential liability it may have toward Plaintiff, by emphasizing the need to focus on medical issues. Time Warner was fully aware of Plaintiff's rights and the existence of Mr. Carter's tapes.

220.    At all times relevant, Plaintiff was not informed of the existence of the Carter's tape by Time Warner or her Fiduciaries.

221.    After the accident, among the confusions, it was clear that Plaintiff and her Fiduciaries were dependent, heavily if not exclusively, on Time Warner for their medical, financial, logistic and other support provided by Time Warner.

222.    In communications with her Fiduciaries, Plaintiff was made aware of and understood that if Time Warner and Goodwill Games were challenged in some fashion, any hope of getting assistance from Time Warner would be extinguished. Plaintiff and her Fiduciaries relied on Time Warner's assistance and support for vital medical care and financial backing. Time Warner was fully aware of its power and position during this accident. Time Warner made it clear to Plaintiff's Fiduciaries that the medical care and support would not be available if it was sued

52

over negligence.

223.    To induce forbearance on the part of Plaintiff and her Fiduciaries, Time Warner made a public announcement (through the media and through press releases), which were set forth with greater detail in paragraph 85 and paragraph 88.

224.    Time Warner made the above promises with a reasonable expectation to induce forbearance on the part of Plaintiff or her Fiduciaries. Time Warner's clear and unambiguous promises to secure Sang Lan's future constituted clear, express terms of a contract or offers to Plaintiff.

225.    When questions were raised about the financial future of Sang Lan, Time Warner affirmatively stated to the public that "Sang Lan's future is secured" and that Sang Lan's parents need not dig into their pocket to help their daughter, through media press releases or other means of communications.

226.    On information and belief, Time Warner or Ted Turner or his agents or employees also communicated to the Chinese team leaders and others in the government of their financial commitments or support to Plaintiff.

227.    The Fiduciaries were also aware of promises, representations, and assurances given by Time Warner through communications or the press releases or the publications by Time Warner.

228.    As expected, and on information and belief, the Fiduciaries were concerned about the uncertainty or risk of litigation; Defendant Time Warner's persistent denial of the existence or possession of any tape or recording device which would show or tended to show the cause of the accident or the culpability of Time Warner and others liable to Plaintiff; and the threat of retaliatory litigation for defamation by Defendant Time Warner against the Fiduciaries. Above all, Fiduciaries were very concerned about losing Time Warner's medical, financial and other

economic support.

229.    From conversations with the Fiduciaries, Plaintiff believed that as long as Time Warner promised that they would do all within their power to see that Plaintiff's future was secure; and that her parents would not be required or to worry about "digging into their pockets" to help their daughter in any way, Plaintiff could and should reasonably rely on those promises by Time Warner and should give up the right to sue. The Fiduciaries recommended that Plaintiff play along and do nothing to antagonize Time Warner, who was in control of the medical care provided to Plaintiff.

230.    Time Warner's express promises did induce such forbearance because Plaintiff, through her Fiduciaries, refrained from bringing lawsuits or asserting her rights in exchange for the promises made by Time Warner. Plaintiff, acting through her Fiduciaries, accepted such offer by her forbearance or refraining from bringing any lawsuits or asserting her rights, and by giving up her important and valuable rights to sue Defendant Time Warner and affiliated companies.

231.    Both Plaintiff and Defendant Time Warner bargained for the exchanges, the financial support in exchange for forbearance, as expressed in the abovementioned press releases or communications or by party's action or inaction.

232.    The express and unambiguous terms of the promised support by Time Warner in exchange for Plaintiff's forbearance established a contractual obligation on Time Warner to ensure Plaintiff's future is secured.

233.    Plaintiff acted accordingly and relied on the promises of Time Warner to her detriment in that she gave up all her rights of bringing actions against Time Warner and affiliated companies and acted for the benefit of Time Warner.

234.    Time Warner partially performed the contract by providing some support as promised.

On information and belief after investigation and inquiry, Time Warner honored some or part of the Contract by providing support or assistance to cover the costs of travel and living expenses of plaintiff's parents while they were in the United States, by paying for certain experimental drugs or medicines or supplies not available in China, providing transportation costs, living expenses, visa fees, and airline costs. Time Warner also solicited donations for Plaintiff, though she was not provided with a record or documentation evidencing such activities.

235.   At all times relevant, Plaintiff had been represented by Fiduciaries in dealing with Time Warner and had not been informed of the details of such dealings.

236.   For reasons set forth above and in this complaint, Plaintiff was afraid and thus refrained from doing anything, which could be perceived as a interference or interruption of Fiduciareis duties because the Fiduciaries' control over Plaintiff's financial, medical, and all other matters or affairs in the United States was tight and exclusive. Plaintiff was precluded from contacting or making an inquiry to Time Warner, her doctors, insurance company or the media. Plaintiff has no information and no say in dealing with Time Warner.

237.   After the Fiduciary released control over Plaintiff's affairs, money and medicines, Plaintiff requested information from the Fiduciaries, who failed or refused to provide information about their dealings with Time Warner.

238.   Thereafter, Plaintiff requested information from Time Warner and made demands to finalize the plan to secure her future, including but not limited to securing payments or reimbursements of certain costs related to or necessary for Plaintiff to receive treatment or rehabilitation, potential deficiency in the coverage of her medical treatments; costs of travel or living expenses necessary to ensure Plaintiff's continuous receipt of medically necessary treatments; and costs necessary to sustain a modest living standard for a paraplegic.

239.    Defendant Time Warner failed or refused to provide information requested. Furthermore, Time Warner provided inconsistent statements concerning the past promises, their past support, donations and matters related to reimbursing costs, plans to secure her future, and promises made to the Chinese leaders.

240.    Defendant Time Warner breached its contractual obligation by failure or refusal, when served with formal demand, to meet Plaintiff's reasonable demand, or provide Plaintiff with a reasonable financial plan necessary to secure her financial future; to pay costs or expenses of care necessary to sustain a modest living standard for a paraplegic; to pay for her costs of travel or living expenses related to or necessary for Plaintiff's medical treatments, rehabilitation and general care.

241.    Plaintiff has performed all conditions, covenants, and promises required on her part to be performed in accordance with the terms and conditions of the contract.

242.    As a result of Time Warner's breach of its promise and obligations imposed upon it by the express and unambiguous terms of the agreement, Plaintiff suffered damages and economic losses.

243.    Given the equitable nature of these concerns, to protect against the harm done to Plaintiff, the enforcement of the agreement would be just because Plaintiff acted to her detriment by forbearing or giving up her rights, and such reliance was reasonable and detrimental to her.

WHEREFORE, Plaintiff prays for Judgment against the Defendant, Time Warner and affiliated companies, jointly and severally, for actual, general, special, and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, and such other and further relief as the Court may deem equitable and proper.

COUNT TWO: PROMISSORY ESTOPPEL (Against Time Warner)

244.    This is an action based on claims of promissory estoppel for damages against Defendant Time Warner, Inc., in excess of $75,000, exclusive of interest, costs and attorney fees.

245.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth, and further alleges:

246.    To induce forbearance on the part of Plaintiff and her Fiduciaries, Time Warner made an express promise with sufficient clear and unambiguous terms as set forth in paragraph 85 and paragraph 88 to ensure that Sang Lan's or Sang Lan family's future is secured.

247.    Defendant Time Warner did in fact or should have reasonably expected for its promise to induce Plaintiff to forbear or refrain from bringing any lawsuits or asserting her rights, and give up her important and valuable rights against Defendant Time Warner and affiliated companies.

248.    The promise by Time Warner was given to avoid liability or potential liability and should be enforce to avoid injustice.

249.    Plaintiff did in fact justifiably rely on these promises of Time Warner to her detriment. Plaintiff acted accordingly for the benefits of all parties concerned and did forbear, refrain from, or give up her important rights and claims to her detriment but to the benefit of Defendant Time Warner and affiliated companies.

250.    Before 2011, Plaintiff's affairs were handled by her "guardians" and agents in the U.S. She was led to believe that she could not and should not do anything, which could be perceived as a challenge to her Fiduciaries and risked losing support from her Fiduciaries. After inquires and questions about the propriety and accounting practices by Fiduciaries turned into disputes, she contacted Time Warner for records and details of the financial plan she thought or was led to believe were in place for her.

251.   Time Warner ignored her requests for information.

252.   In 2011, Plaintiff made a formal request to Time Warner to begin the discussion about the plan to secure her future, including but not limited to securing payments or reimbursement of certain costs related to or necessary for Plaintiff to receive treatment or rehabilitation, and costs necessary to sustain a modest living standard for a paraplegic.

253.   As of the date of the complaint, Defendant Time Warner took no action to either engage in discussions or formulate a plan as promised.

254.   As result of Time Warner's breach of its promise and obligations, Plaintiff suffered damages and economic losses.

255.   If the promises by Time Warner are not enforced, injustice will ensue.

WHEREFORE, Plaintiff prays for Judgment against the Defendant, Time Warner and affiliated companies, jointly and severally, for actual and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, and such other and further relief as the Court may deem equitable and proper.

COUNT THREE: UNDERTAKING AND RELIANCE (Against Time Warner)

256.   This is an action based on claims of undertaking and reliance for damages against Defendant Time Warner, Inc., in excess of $75,000, exclusive of interest, costs and attorney fees.

257.   Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth, and further alleges:

258.   Time Warner intervened and assumed the responsibility to secure Sang Lan's financial future. Once it did, it created a duty on Time Warner to take necessary steps and action to "secure Sang Lan's future."

259.   Once Time Warner undertakes the duty of care, it should not leave Plaintiff in a worse

position.

260.   Furthermore, having assumed the duty of care for Plaintiff, Time Warner is obligated to act reasonably once it made those public announcement and made firm commitment to Plaintiff's parents and to Plaintiff with promises to secure Plaintiff's future.

261.   Plaintiff and her parents relied on Time Warner's promises and assumption of the undertaking to aid Plaintiff.

262.   Plaintiff's reliance to her detriment on Time Warner assumption of undertaking was reasonable as it was part of a bargained for undertaking to secure Plaintiff's future.

263.   At all times relevant, Time Warner never denied the obligation of undertaking until Plaintiff made a request in 2011 for making further financial plans.

264.   The recent reneging on the undertaking by Time Warner should be enforced to avoid injustice.

WHEREFORE, Plaintiff prays for Judgment against the Defendant, Time Warner and affiliated companies, jointly and severally, for actual and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, and such other and further relief as the Court may deem equitable and proper.

COUNT FOUR: ACCOUNTING AS TO THE FUND (Against the Lius and Mo)

265.   This is an action for accounting and other injunctive relief against Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, as trustee or manager, Hugh H. Mo, as attorney or trustee or manager of that certain charity fund known as Goodwill For Sang Lan Fund (the "Fund"), (the Lius and Mo collectively referred to as the "Fund Managers"), jointly and severally.

266.   Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1

through 204 above and with the same force and effect as if herein set forth, and further alleges:

267.    Plaintiff has demanded an accounting of the Fund, including but not limited to money received, expenses or disbursement, but Fund Managers have failed and refused, and continue to fail and refuse to render such an accounting.

WHEREFORE, Plaintiff prays for Judgment against the Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, as trustee or manager of the Goodwill For Sang Lan Fund, Hugh Hu Mo, as attorney or manager or trustee for the Goodwill For Sang Lan Fund and unknown trustees or managers, jointly and severally, as follows:

  a. For an accounting of the Fund rendered by defendants without costs to Plaintiff or Plaintiff's funds;

  b. For the amount found to be due from defendant Trustees, jointly and severally, to plaintiff as a result of the accounting and interest on that amount from and after 1998 through the date of judgment;

  c. For disgorgement of funds comingled with Defendants' own funds;

  d. For actual, general, special, compensatory damages resulting from Defendant Trustees' conduct in failure or refusal to render accounting in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees, and such other and further relief as the Court may deem equitable and proper.

## COUNT FIVE: ACCOUNTING AS TO OTHER PROPERTY (Against the Lius)

268.    This is an action for accounting of other property of Plaintiff against Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally.

269.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above and with the same force and effect as if herein set forth, and further alleges:

270.   From 1998 through April 2011, the Lius held themselves out and acted as exclusive agents for Plaintiff. They controlled all aspects of Plaintiff's affairs, matters, money, insurance claims, benefits, medical supplies and equipment.

271.   At all times relevant, the Lius did not provide and have not provided accounting for property, equipment, medical supplies or medicines, insurance claims filed and insurance settlement money received on Plaintiff's behalf.

272.   In addition, the Lius kept the Memorabilia to themselves without returning to Plaintiff.

273.   Plaintiff has demanded an accounting of the property in Defendants' possession, including but not limited to money received, expenses or disbursement, but defendant has failed and refused, and continues to fail and refuse, to render such an accounting.

274.   Through the date of filing the Complaint, the Lius refused Plaintiff's request for accounting.

WHEREFORE, Plaintiff prays for Judgment against the Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally, as follows:

      a.   For an accounting without costs to Plaintiff of the property, Memorabilia, funds, insurance proceeds or benefits applied for and received by defendants on Plaintiff's behalf;

      b.   For actual, general, special, compensatory damages resulting from Defendant Trustees' conduct in failure or refusal to render accounting in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees, and such other and further relief as the Court may deem equitable and proper.

### COUNT SIX: UNJUST ENRICHMENT (Against the Lius)

275.   This is an action based on claims of unjust enrichment against Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and

severally.

276.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above and with the same force and effect as if herein set forth, and further alleges:

277.    From 1998 through April 2011, the Lius held themselves out and acted as "guardians", trust fund trustees or managers, and the exclusive agents for Plaintiff. They controlled all aspects of Plaintiff's affairs, concerning or pertaining to her money, her property, insurance claims, medical benefits, medical supplies and equipment.

278.    As fiduciaries, the Lius owed Plaintiff undivided loyalty, fidelity and integrity.

279.    Plaintiff was not provided with any records or accounting of her properties and Memorabilia retained by the Lius. The vague and sporadic representations made by the Lius, while acting as Plaintiff's fiduciaries, were contradictory, confusing and misleading.

280.    At all times relevant, the Lius did not account for, kept and took possession of Sang Lan's money, insurance proceeds, property, medical supplies, Memorabilia belonging to Plaintiff.

281.    The Lius benefited by the keeping Plaintiff's property and their failure or refusal to return Plaintiff property when demanded by Plaintiff in 2011 constituted unjust enrichment and that equity and good conscience require restitution.

WHEREFORE, Plaintiff prays for Judgment against the Defendant, Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally, for restitution of property and for actual, general, special, and compensatory damages in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees and such other and further relief as the Court may deem equitable and proper.

COUNT SEVEN: CONVERSION (Against the Lius)

282.    This is an action for damages and other injunctive relief based on claims of conversion of personal property against Defendants, Kao-Sung Liu a/k/a K.S. Liu, Gina Hiu-Hung Liu a/k/a Hui-Hung Sie a/k/a Gina Liu, jointly and severally, in excess of $75,000 exclusive interest, costs and attorney fees.

283.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth.

284.    As set forth in the preceding paragraph 76, during Plaintiff's stay for medical treatment in the United States, persons from all walks of life gave her greeting cards, photos, gifts and various memorabilia.

285.    By way of example, not meant to be exhaustive, the following were given to Sang Lan: a frog from Celine Dion; a Photo Album commemorating Sang Lan's visit to the United States and photos with dignitaries and American people; photos with Leonardo DiCaprio and his gifts (a bear and greeting card); a box full of video tapes from Jackie Chan; letters from President Clinton and other dignitaries; a collection of stamps featuring the Year of Rabbit; an award presented to Sang Lan by Vice President Gore's wife and many of similar awards; gifts and letters from Former President Jimmy Carter and his wife, Rosalynn Carter; letters former President Ronald Reagan with an elephant; awards, certificates or proclamations or declarations from the state congress or parliament members, gifts from Chinese leaders and Premiere Zhu Rong Ji; a bed specially made for Sang Lan (allowing her to turn); a specially made bathing wheel chair ordered by the insurance company for Sang Lan; special orders of medical supplies provided to Sang Lan in 2010 and 2011; and letters, souvenirs, photos, memorable items and documents from the people of the United States ("Memorabilia") belonging to Sang Lan were

kept by the Lius for "safe keeping" and have not been returned to her.

286.   Plaintiff was given and therefore owned the Memorabilia from the presidents, actors, singers, and well-wishers; and they were left for safekeeping with the Lius.

287.   At all times relevant, the Lius kept and took possession of any money, insurance proceeds, property or funds or Memorabilia unaccounted for belonging to Plaintiff.

288.   At all times relevant, the Lius also kept and took possession of any money, insurance proceeds, property or funds or Memorabilia unaccounted for belonging to Plaintiff.

289.   The Lius keeping and taking possession of Plaintiff's Memorabilia, money, insurance proceeds, property or fund unaccounted for and failing or refusing to return them to Plaintiff is the unauthorized assumption and exercise of the right of ownership over property and things belonging to Plaintiff to the exclusion of Plaintiff's rights.

290.   Given the domineering nature of the relationship, and Plaintiff's dependence on medical supplies and money controlled by the Lius, Plaintiff did not want to do anything that may be perceived as a challenge to the Lius.

291.   As true owner of the property and Memorabilia, Plaintiff has a superior right of possession.

292.   Plaintiff did not abandon her property and the Memorabilia.

293.   After the unilateral termination of the relationship in or about 2011, Plaintiff made requests for the safe return of her property, money, and the Memorabilia.

294.   The Lius failed or refused to return those property and Memorabilia when demanded by Plaintiff in May 2011.

295.   Plaintiff is entitled to the safe return of her property and the Memorabilia at no cost to her; to recover the property by replevin or damages as result of the Lius' conversion.

296.    The conduct of defendants alleged above involved intentional misrepresentations, deceit, or concealment of material facts known to defendants with the intention on the part of defendants of thereby depriving Plaintiff of property or legal rights or otherwise causing injury, so as to justify an award of punitive damages.

WHEREFORE, Plaintiff prays for Judgment against the Defendants Kao-Sung Liu a/k/a K.S. Liu, Gina Hiu-Hung Liu a/k/a Hui-Hung Sie a/k/a Gina Liu, jointly and severally, for conversion of personal property as follows:

a.  For an accounting without costs to Plaintiff of the property unlawfully taken;

b.  For the safe return and delivery to Plaintiff any and all personal property belonging to Plaintiff;

c.  For actual, general, special, compensatory damages resulting from Defendants' conduct in failure or refusal to return the property or to render accounting in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action;

d.  And such other and further relief as the Court may deem equitable and proper.

### COUNT EIGHT: BREACH OF FIDUCIARY DUTY (Against the Lius)

297.    This is an action for breach of fiduciary duty against Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally, in excess of $75,000, exclusive interest, costs and attorney fees.

298.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth, and further alleges:

299.    At all relevant times, the Lius held themselves out and acted as exclusive agents, "guardians", representatives, publicists, contacts and agents for insurance claim matters, trustees or managers of the Good Will for Sang Lan Fund ("Fund").

300.    The Lius had a fiduciary relationship with Plaintiff based on trust and confidence, that

derived from the fact that the Lius were entrusted by the Chinese Gymnast as her "guardians" to handle her affairs.

301.    The Lius controlled all aspects of Plaintiff's affairs, money, medications and medical supplies and communications with her doctors, insurance company and other vital support organizations.

302.    Plaintiff depended on the Lius to discharge their fiduciary duty in her best interest. By virtue of this special relationship that existed between the Lius and Plaintiff, Plaintiff had confidence in the loyalty, fidelity and integrity of the Lius and entrusted the Lius with her money, her property, the continuous procurement of her medications and medical supplies not available in China, the necessary and vital link to receive benefits from her insurance company, information and access to her contact, image, photo, likeness. This creates a fiduciary relationship dominated by the Lius, which Plaintiff depended on at all times relevant to this Complaint.

303.    The Lius owed to Plaintiff a fiduciary duty to discharge their duty responsibly, and not take advantage of Plaintiff.

304.    Between October 1998 and continuing, on information and belief, to the present, at a time or times presently unknown to Plaintiff, despite having voluntarily accepted the trust and confidence of Plaintiff, the Lius violated and abused the trust and confidence of Plaintiff by failure to discharge their duty with utmost loyalty, fidelity and integrity, to keep accurate account of her money or property, to follow through with financial plans with Time Warner; to make full disclosure of and account for their business or profit made by using her celebrity status, professional persona, image, photo, voice and likeness without permission.

305.    As a result of the Lius' breach of fiduciary duties to Plaintiff alleged above, Plaintiff

suffered economic losses and the Lius gained the advantage of earning and did earn substantial compensation and fame.

WHEREFORE, Plaintiff prays for Judgment against the Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, as fiduciaries, jointly and severally, for disgorgement of funds comingled with Defendants' own funds; and for actual, general, special, compensatory damages resulting from Defendants' breach of fiduciary duties in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees, and such other and further relief as the Court may deem equitable and proper.

## COUNT NINE: BREACH OF FIDUCIARY DUTY (Against Mo)

306. This is an action for damages based on claims of fiduciary duty against Hugh H. Mo in excess of $75,000 exclusive interest, costs and attorney fees.

307. Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 with the same force and effect as if herein set forth.

308. Mo held himself out and acted as attorney for Plaintiff and for the Sang Lan Fund, provided legal or professional service on matters related to Sang and to the Fund.

309. Plaintiff depended on Mo to discharge his fiduciary duty in her best interest and exercise independent professional judgment, to avoid conflict interest and not to represent others adverse to her interest in anticipation to testify against her.

310. As Plaintiff's former attorney, Mo owed Plaintiff certain fiduciary duties or professional responsibilities, which includes but is not limited to the following:

     a. The duty to keep his clients informed and to communicate all important decisions for their consideration;

     b. The duty to disclose and discuss conflicts of interest and potential conflicts of

interest;

    c.  The duty to take action to protect client interest.

    d.  The duty to not to put his personal pecuniary or other interests above those of his clients.

311.    By the above alleged actions and inaction, Mo breached his duties to his client in a number of ways, including the following:

    a.  By failure or refusal to keep Sang Lan Informed and to communicated all important decisions to Sang Lan;

    b.  By failure or refusal to act, to follow through with Time Warner's plan to secure Sang Lan's financial future;

    c.  Acting against and taking an adverse position against Plaintiff, a former client;

    d.  Failing or refusing to disclose conflicts of interest or potential conflicts of interest;

    e.  Failing or refusing to competently discharge duties related to the Fund;

    f.  Failing to account to his client, Plaintiff, for funds in the Fund.

312.    As a result of the Mo's breach of fiduciary duties to Plaintiff alleged above, Plaintiff suffered economic losses.

WHEREFORE, Plaintiff prays for Judgment against the Defendant Hugh Hu Mo, for actual, general, special, compensatory damages resulting from Defendant Mo's breach of fiduciary duties in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees, and such other and further relief as the Court may deem equitable and proper.

## COUNT TEN: DEFAMATION (Against the Lius)

313.    This is an action for damages and injunctive relief based on claims of defamation against Defendants, Kao-Sung Liu a/k/a K.S. Liu, Gina Hiu-Hung Liu a/k/a Hui-Hung Sie a/k/a Gina Liu, jointly and severally, in excess of $75,000 exclusive interest, costs and attorney fees.

314.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 with the same force and effect as if herein set forth and further alleges:

315.    The Lius made the foregoing statements as contained in paragraphs 185 through 188 with the knowledge that they were false or with callous and reckless disregard as to the truth of the statements they made.

316.    The Lius published the defamatory statement with malice with singular design to subject Plaintiff to public ridicule and humiliation, to ruin Plaintiff's reputation and professional career. The Lius' remarks did expose Plaintiff to hatred, contempt or to induce an unsavory opinion of Plaintiff in the minds of a substantial number of individuals in the community.

317.    The Lius' statements were neither privileged nor protected.

318.    As a direct and proximate result of the Lius' defamatory statements, Plaintiff has suffered, continues to suffer, and will continue to suffer loss of income, damage to her personal and professional reputation, and mental anguish and humiliation.

319.    Plaintiff has no adequate legal remedy in that damages are inadequate to remedy the harm to Plaintiff, to the sanctity of the fiduciary relationship and the harm that would be caused by the defamatory statements and public disclosure and extensive public dissemination of information purported to be confidential and privileged but obtained by the Lius as Plaintiff's fiduciaries in the anticipated publication of their books, since once such false statements are made in public or information is disclosed to the internet or a large television audience it cannot be undone.

WHEREFORE, Plaintiff prays for Judgment against the Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally, as follows:

>    a.    For equitable relief in the form of an injunction directed to Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie enjoining them from making false statements directly or indirectly, or engage in any act or conduct, which would harm Plaintiff or her reputation;

      b.   Requiring Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie to retract, renounce, repudiate and otherwise fully denunciate the false statements they have made in or on all sites, blogs, news papers, or other means of communication;

      c.   For actual, general, special, compensatory and punitive damages against Defendants in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including reasonable attorney's fees,

      d.   And such other and further relief as the Court may deem equitable and proper.

COUNT ELEVEN: INVASION OF PRIVACY

320.   This is an action for damages based on violations of right to privacy under §50 and §51 of the New York Civil Rights Law against Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally, in excess of $75,000, exclusive interest, costs and attorney fees.

321.   Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth, and further alleges:

322.   As a result of the Lius' violations of her right of privacy protected by §50 and §51 of the New York Civil Rights Law and their breach of fiduciary duties to Plaintiff alleged above, the Lius gained the advantage of earning and have earned substantial fortune, compensation and fame.

323.   The Lius' use and appropriation of Plaintiff's celebrity status, professional persona, name, photographs, voice, image, or likeness as described above proximately caused harm to Plaintiff. The Lius never accounted for the compensation or income from such use and Plaintiff has suffered damages or financial loss as result of such violation of her rights, including but not limited to loss of income and injuries to her public images and reputation.

324.   The Lius' use and appropriation of Plaintiff's celebrity status, professional persona, name, photographs, voice, image, or likeness as described above has and continues to cause

Plaintiff irreparable injury and harm and is ongoing and continuing.

325.    Plaintiff has no adequate legal remedy for the Lius' continuing violations of her right and the Lius' breach of fiduciary duties in that damages are inadequate to remedy the harm to her reputation, loss of income, harm in the form of incessant character assassinations, to the sanctity of the fiduciary relationship and the harm that would be caused by unauthorized use of her images or the likeness mixed with the defamatory statements and public disclosure and extensive public dissemination of information purported to be confidential and privileged but obtained by the Lius as Plaintiff's fiduciaries, since once such false statements are made in public or information is disclosed to the internet or a large television audience it cannot be undone..

WHEREFORE, Plaintiff prays for Judgment against the Defendants Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, jointly and severally, as follows:

e.  For equitable relief in the form of an accounting without costs to Plaintiff of profits made by Defendants Lius as result of their violations of her rights herein stated;

f.  Full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants Lius as a result of such unauthorized use of celebrity status, professional persona, name, photographs, voice, images, or likeness;

g.  Imposition of a constructive trust over the proceeds of such violations or breach;

h.  For actual, general, special, compensatory, punitive damages resulting from Defendants' conduct in violation of her rights and breach of fiduciary duty in an amount deemed at time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees,

i.  And such other and further relief as the Court may deem equitable and proper.

COUNT TWELVE: CYBERHARASSMENT [Against the Lius and Does 1-30]

326.    This is an action for damages and injunctive relief based on claims for violations of cyber

harassment law, and to the extent allowed by New York Penal Laws §240.30 against Defendants, Kao-Sung Liu a/k/a K.S. Liu, Gina Hiu-Hung Liu a/k/a Hui-Hung Sie a/k/a Gina Liu, Does 1-30, jointly and severally, in excess of $75,000 exclusive interest, costs and attorney fees.

327.    Plaintiff repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 204 above with the same force and effect as if herein set forth.

328.    Plaintiff has no adequate legal remedy for this violation of NY Penal Law in that damages are inadequate to remedy the harm to Plaintiff.

329.    In committing the acts alleged above, defendants acted with oppression, fraud, and malice, such that Plaintiff is entitled to punitive damages.

WHEREFORE, Plaintiff demands judgment against Kao-Sung Liu a/k/a K.S. Liu and Gina Liu a/k/a Gina Hiu-Hung Liu a/k/a Hui-Hung Sie, husband and wife, Does 1-30, jointly and severally, for actual, general, special, compensatory and punitive damages in an amount deemed at time of trial to be just, fair, and appropriate and further demands judgment against each of said Defendants, jointly and severally, plus the costs of this action, including attorney's fees, and such other and further relief as the court may deem appropriate.

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands trial by jury on all issues triable by jury.

Dated: October 5, 2012.


_____/s/_____
X. Bing Xu, Esquire (BX8888)
Attorney for Plaintiff
5705 Hansel Avenue
Orlando, Florida 32809
(407)851-1000
bing@binglawfirm.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 3, 2012, a copy of the foregoing was or caused to be electronically filed with the Clerk of the Court using CM/ECF system, which will send notification of such filing and make available for reviewing and receipt by the following counsel of record:

HUGH MO, Esquire
Frank Chiu, Esquire
225 Broadway, Suite 2702
New York NY 10007
Attorney Pro Se and for defendants the Lius

I FURTHER CERTIFY that a copy of the foregoing was or caused to be served by [X] email [ ] mail [ ] personal service [ ] to following additional party or counsel of record:

James A. Lamberth
TROUTMAN SANDERS LLP
Suite 5200, Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
Direct:  (404) 885-3362
Direct Fax:  (404) 962-6611

_____/s/_____
X. Bing Xu, Esquire (BX8888)
Attorney for Plaintiff

Exhibits Attached to Fourth Amended Complaint

Exhibit A (1988 Goodwill Games Press Release: Sang Lan's Bio Information)

Exhibit B (Sports Illustrated: Paralyzed Gymnast's Parents Begin Sad Journey To Her Bedside. 7/24/1998. AP Reports).

Exhibit C (Photos Showing Recording Cameras)

Exhibit D (Local Coach Hounded For Tape Of Chinese Gymnast's Injury - Jack Carter Happened To Film Sang Lan's Fateful Routine At Goodwill Games. Suddenly, Everyone Was Looking For Him. 8/26/1998. By Paul Reinhard).

Exhibit E (New York Daily News: Tragedy Gets The Best Of Vet Lampley. 7/24/1998. By Bob Raissman)

Exhibit F (Sang Lan Press Conference July 22, 1998, Page 2: Paragraph 6)

Exhibit G (Turner/Goodwill Games Press Release, July 24, 1998, page 2: paragraph 5)

Exhibit H (Sports Illustrated: Paralyzed Gymnast's Parents Begin Sad Journey To Her Bedside. 7/24/1998. AP Reports)

Exhibit I (Turner/Goodwill Games Press Release, July 26, 1998, page 3: paragraph 1)

Exhibit J (New York Daily News, Injured Gymnast: Turner Reneged. 06/03/1999. By Bill Egbert)

Exhibit K (Sports Illustrated: Surgery A Success, But Chinese Gymnast Unlikely To Walk. AP: 7/26/1998)

Exhibit L (the Lius music CDs, blogs)Exhibit L (the Lius music CDs, blogs)

Exhibit M (the Lius' Defamatory Statements)